[No. G009097. Fourth Dist., Div. Three. May 26, 1992.]

HALBERT'S LUMBER, INC., Plaintiff and Appellant, v.
LUCKY STORES, INC., et al., Defendants and Respondents.

**COUNSEL**

Hunt, Ortmann, Blasco, Palffy & Rossell, Gordon Hunt and Ronald E. White for Plaintiff and Appellant.

Voss, Cook, Casselberry & Thel and Edward L. Laird for Defendants and Respondents.

**OPINION**

**SILLS, P. J.—**

### INTRODUCTION

This case presents a real doozy of a puzzle in mechanic's lien law. What is the scope of the "conditional waiver release" of mechanic's lien rights prescribed by Civil Code section 3262, subdivision (d)(1)? This statute specifies the language and format of a release of mechanic's lien rights in return for a progress payment. The parties here used a release form following the statutory language virtually verbatim.

Two questions confront us. The first is the meaning of the word "furnished" as used in the release form. Does "furnished" mean delivery of materials to a construction site, or does it mean the actual use or incorporation of those materials into the structure?

This is the less difficult of the two questions. The ordinary meaning of "furnished" is delivery to the jobsite.

The second question is the extent of the mechanic's lien rights that are being released. Does the release extend only to the materials for which the

supplier has actually been compensated, or does it extend to all materials furnished through the date of the progress payment? Both the statutory language and legislative history on this point are ambiguous; they shine like a dim lantern though a frosty window in a snowstorm.

In such a case, where neither language nor legislative intent is readily discernable, we are forced to interpret the statute to make it reasonable, practical, and avoid an absurd result. In so doing, we affirm the decision of the trial judge. A release is intended to be a release, not a glorified receipt. If the release form here only covered mechanic's lien rights to the extent the payment actually compensates for the materials furnished, the Legislature need not have bothered. The statute would be mere surplusage and accomplish nothing.

FACTS

In November 1985, Near-Cal Corporation (the general contractor) agreed to build a supermarket for Lucky Stores, Inc. (the owner) in Fountain Valley. In February 1986, M & F Development and Construction (the subcontractor) agreed with the general contractor to provide rough framing. On April 22, 1986, the subcontractor placed an order with Halbert's Lumber, Inc. (the lumber company) for about two truckloads of "glu lam" beams for use in the project. The subcontractor needed the beams as soon as possible.

The order was too large for the lumber company to supply from its own yard, so it placed an order with Laminated Timber Service to have the beams shipped directly to the jobsite. The lumber company did not bill the subcontractor for the beams at that time; its practice was *not* to bill its customers when it placed an order, but wait until it received proof the materials were on the jobsite.

The beams arrived on May 12, 1986, and May 15, 1986, when they were delivered to a parking lot. About May 20, 1986, the subcontractor told the lumber company it wanted a release of the lumber company's lien rights through May 19. The lumber company signed a release, which read:

"CONDITIONAL WAIVER RELEASE UPON PROGRESS PAYMENT

"Upon receipt by the undersigned of a check from [the general contractor] in the sum of $24,187.09 payable to [the lumber company] and when the check has been properly endorsed and has been paid by the bank upon which it was drawn, this document shall become effective to release pro tanto* any mechanic's lien, stop notice, or bond right the undersigned has on the job of

[the owner] located at Brookhurst & Ellis in the city of Fountain Valley, California, to the following extent. This release covers a progress payment for materials furnished to [the subcontractor] through May 19, 1986 only and does not cover any retention or items furnished after said date. Before any recipient of this document relies on it, said party should verify evidence of payment to the undersigned.

"Dated: May 20, 1986 By Russell Halbert

Title VP/Gen. Mgr.

" *for so much; for as much as may be; as far as it goes."

When it signed the release, the lumber company had not yet posted the cost of the beams for billing to the subcontractor. The $24,187.09 figure was based on five or six invoices for other lumber which had been posted prior to May 20. The lumber company was not aware the beams were already at the jobsite and the figure did not include the cost of those beams, although it did have the invoice showing the subcontractor's order in April and a "due in" date of May 12.

The beams were installed in the period June 3 through June 5. About four days later, on June 9, the lumber company posted its invoice on the subcontractor's order for the beams for billing to the subcontractor. The earlier claim for $24,187.09 was paid in early July.

The lumber company was never compensated for the beams, however. The general contractor terminated its contract with the subcontractor, and the subcontractor eventually filed for bankruptcy, listing the lumber company as one of its creditors. In August, the lumber company filed a mechanic's lien for $70,122.04—a figure which *did* include the beams as well as lumber delivered after the release. In October a bond to release the mechanic's lien was filed, and in November the lumber company filed this lawsuit. Because of the release, the judgment of the trial court did not allow the lumber company to recover the cost of the beams from the issuer of the bond, and from that judgment the lumber company appeals.

DISCUSSION

### *The Problem of Statutory Interpretation*

More than 40 years ago, Karl Llewellyn authored a now classic law review article in which he took great delight in listing, side by side,

contradictory maxims of statutory interpretation.[1] Llewellyn's thesis was that judges pick and choose among the rules to arrive at a result consonant with their own judicial temperament and philosophy.

At its logical extreme, Llewellyn's thesis would mean there is no law when it comes to the interpretation of law itself. It all depends on the "felt need" emanating from the particular "situation" and "controversy" before the court.[2] But the rules of statutory interpretation are not quite so plastic as Llewellyn's article might lead us to believe. ■ There is order in the most fundamental rules of statutory interpretation if we want to find it. The key is applying those rules in proper *sequence*.

First, a court should examine the actual language of the statute. (*Mercer* v. *Department of Motor Vehicles* (1991) 53 Cal.3d 753, 763 [280 Cal.Rptr. 745, 809 P.2d 404]; *Curl* v. *Superior Court* (1990) 51 Cal.3d 1292, 1300 [276 Cal.Rptr. 49, 801 P.2d 292]; *Solberg* v. *Superior Court* (1977) 19 Cal.3d 182, 198 [137 Cal.Rptr. 460, 561 P.2d 1148]; *Leroy T.* v. *Workmen's Comp. Appeals Bd.* (1974) 12 Cal.3d 434, 438 [115 Cal.Rptr. 761, 525 P.2d 665]; *Moyer* v. *Workmen's Comp. Appeals Bd.* (1973) 10 Cal.3d 222, 230 [110 Cal.Rptr. 144, 514 P.2d 1224].) Judges, lawyers and laypeople all have far readier access to the actual laws enacted by the Legislature than the various and sometimes fragmentary documents shedding light on legislative intent. More significantly, it is the language of the statute itself that has successfully braved the legislative gauntlet. It is that language which has been lobbied for, lobbied against, studied, proposed, drafted, restudied, redrafted, voted on in committee, amended, reamended, analyzed, reanalyzed, voted on by two houses of the Legislature, sent to a conference committee, and, after perhaps more lobbying, debate and analysis, finally signed "into law" by the Governor. The same care and scrutiny does not befall the committee reports, caucus analyses, authors' statements, legislative counsel digests and other documents which make up a statute's "legislative history."

In examining the language, the courts should give to the words of the statute their ordinary, everyday meaning (e.g., *People* ex rel. *Younger* v. *Superior Court* (1976) 16 Cal.3d 30, 40 [127 Cal.Rptr. 122, 544 P.2d 1322]; *Merrill* v. *Department of Motor Vehicles* (1969) 71 Cal.2d 907, 918 [80 Cal.Rptr. 89, 458 P.2d 33]; see also *Mercer* v. *Department of Motor Vehicles, supra,* 53 Cal.3d at p. 763 [traditional and plain meaning]) unless, of course, the statute itself specifically defines those words to give them a special meaning (*Security Pacific National Bank* v. *Wozab* (1990) 51 Cal.3d 991, 998

---

[1]Llewellyn, *Remarks on the Theory of Appellate Decision and the Rules or Canons About How Statutes Are to Be Construed* (1950) 3 Vand.L.Rev. 395, 401-406 (Llewellyn).

[2]See Llewellyn, *supra,* 3 Vand. L. Rev. at page 398.

[275 Cal.Rptr. 201, 800 P.2d 557]; *Great Lakes Properties, Inc.* v. *City of El Segundo* (1977) 19 Cal.3d 152, 156 [137 Cal.Rptr. 154, 561 P.2d 244]).

If the meaning is without ambiguity, doubt, or uncertainty, then the language controls. (*Security Pacific National Bank* v. *Wozab, supra,* 51 Cal.3d at p. 998; *Delaney* v. *Superior Court* (1990) 50 Cal.3d 785, 798 [268 Cal.Rptr. 753, 789 P.2d 934]; *In re Waters of Long Valley Creek Stream System* (1979) 25 Cal.3d 339, 348 [158 Cal.Rptr. 350, 599 P.2d 656]; *Great Lakes Properties, Inc.* v. *City of El Segundo, supra,* 19 Cal.3d at p. 155; *Armstrong* v. *County of San Mateo* (1983) 146 Cal.App.3d 597, 610 [194 Cal.Rptr. 294]; *Smith* v. *Rhea* (1977) 72 Cal.App.3d 361, 365 [140 Cal.Rptr. 116].) There is nothing to "interpret" or "construe." (*Lungren* v. *Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115 [755 P.2d 299]; *IGA Aluminum Products, Inc.* v. *Manufacturers Bank* (1982) 130 Cal.App.3d 699, 703 [181 Cal.Rptr. 859]; *Roulston* v. *Pacific Tel. & Tel. Co.* (1979) 96 Cal.App.3d 149, 154 [158 Cal.Rptr. 43]; *People* v. *Flores* (1979) 92 Cal.App.3d 461, 472 [154 Cal.Rptr. 851]; *Skivers* v. *State of California* (1970) 13 Cal.App.3d 652, 655 [91 Cal.Rptr. 707]; *People* v. *Pacific Guano Co.* (1942) 55 Cal.App.2d 845, 847-848 [132 P.2d 254].)

But if the meaning of the words is not clear, courts must take the second step and refer to the legislative history. (*Long Beach Police Officers Assn.* v. *City of Long Beach* (1988) 46 Cal.3d 736, 743 [250 Cal.Rptr. 869, 759 P.2d 504]; *Sand* v. *Superior Court* (1983) 34 Cal.3d 567, 570 [194 Cal.Rptr. 480, 668 P.2d 787].)

The final step—and one which we believe should only be taken when the first two steps have failed to reveal clear meaning—is to apply reason, practicality, and common sense to the language at hand. If possible, the words should be interpreted to make them workable and reasonable (e.g., *Regents of University of California* v. *Superior Court* (1970) 3 Cal.3d 529, 536-537 [91 Cal.Rptr. 57, 476 P.2d 457]; *People* v. *Zikorus* (1983) 150 Cal.App.3d 324, 330 [197 Cal.Rptr. 509]; *Estate of Cottle* (1983) 148 Cal.App.3d 1023, 1028 [196 Cal.Rptr. 440]; *County of Orange* v. *Cory* (1979) 97 Cal.App.3d 760, 768 [159 Cal.Rptr. 78]; *Intoximeters, Inc.* v. *Younger* (1975) 53 Cal.App.3d 262, 270 [125 Cal.Rptr. 864]; *Committee of the Rights of the Disabled* v. *Swoap* (1975) 48 Cal.App.3d 505, 512 [122 Cal.Rptr. 52]), practical (*People* v. *Hinojosa* (1980) 103 Cal.App.3d 57, 64 [162 Cal.Rptr. 793]; *Fireman's Fund Ins. Co.* v. *Security Pacific Nat. Bank* (1978) 85 Cal.App.3d 797, 815 [149 Cal.Rptr. 883]), in accord with common sense and justice, and to avoid an absurd result (*In re Eric J.* (1979) 25 Cal.3d 522, 537 [159 Cal.Rptr. 317, 601 P.2d 549]; *Clements* v. *T. R. Bechtel Co.* (1954) 43 Cal.2d 227, 233 [273 P.2d 5]; *Lampley* v. *Alvares* (1975) 50

Cal.App.3d 124, 128-129 [123 Cal.Rptr. 181]). We now apply this three-step approach to the two questions on which this case turns: the meaning of "furnished" and the extent of the release.

### The Meaning of "Furnished"

The release form purports to "release pro tanto any mechanic's lien, stop notice, or bond right" the lumber company had on the supermarket project. Therefore the first issue is whether the lumber company had any waivable "mechanic's lien . . . right" arising out of the delivery of the glu lam beams before their installation. ■ The lumber company contends its lien rights in the glu lam beams did not arise until the beams were actually installed in the new market and therefore the release could not include them.

We need only resort to the first level of statutory analysis—the ordinary meaning of the language—to determine whether the beams were "furnished" to the site within the meaning of the release. The usual, ordinary import of "furnish" is to make something *available*. The first definition of "furnish" in Webster's Third New International Dictionary (1986) at page 923, is: "to provide or supply with what is needed, useful, or desirable." To deliver materials to a job site is certainly to "provide" materials.

The ordinary import of "furnished" is consistent with case law on when mechanic's liens "attach." The issue was first addressed in *People* v. *Moxley* (1911) 17 Cal.App. 466 [120 P. 43]. The facts in *Moxley* are not set out in detail, but apparently involved a defendant who had obtained money by making false statements before a notice of lien was recorded. The appeal required the court to determine "when the liens of mechanics and material-men attach." (17 Cal.App. at p. 468.) The court determined such liens attach "as the material is furnished or labor performed." (*Ibid.*) Further, the mechanic's lien "exists with all of its force at all times between the furnishing of the material or the performing of the labor, and the expiration of the time within which such notices of lien may be filed." (*Ibid.*) The "as the material is furnished" language from *Moxley* has been reiterated in several subsequent cases. (*English* v. *Olympic Auditorium, Inc.* (1933) 217 Cal. 631, 638 [20 P.2d 946, 87 A.L.R. 1281]; *Schrader Iron Works, Inc.* v. *Lee* (1972) 26 Cal.App.3d 621, 631-632 [103 Cal.Rptr. 106];[3] *Mazzera* v. *Ramsey* (1925) 72 Cal.App. 601, 606 [238 P. 101].)

Additionally, *Walker* v. *Lytton Sav. & Loan Assn.* (1970) 2 Cal.3d 152 [84 Cal.Rptr. 521, 465 P.2d 497] demonstrates mechanic's lien rights attach at

---

[3]In *Schrader Iron Works* the court said the plaintiff's lien attached on the date certain structural steel was first installed. (Compare 26 Cal.App.3d at p. 632 [lien attached on Sept. 22] with 26 Cal.App.3d at p. 627 [steel installed on Sept. 22].) The facts of *Schrader Iron Works*, however, did not require the court to address the issue of whether any waivable lien rights arose upon delivery.

the time of delivery. In *Walker*, architects prepared plans and specifications for a proposed apartment building before any work was done on the owners' property or any materials were delivered. Later—but still before any work had been done or materials delivered—a lender made a construction loan and recorded a deed of trust. Afterward, existing structures were demolished, and the building site was graded, excavated, and fenced. No further work occurred and the architects recorded a claim of mechanic's lien. The Supreme Court was eventually called upon to decide who had priority, the lender or the architects. That issue, in turn, required the court to determine if the work of improvement had "commenced" with the architects' off-site plans and drawings. If so, then their lien would have priority. But the court ruled against the architects, holding their lien did not attach "before any work ha[d] been done on the owners' property or *materials delivered* thereto for a planned improvement." (2 Cal.3d at p. 159, italics added.)

*Walker* shows the Supreme Court considered delivery of material to be sufficient to constitute the "commencement" of the work of improvement. This is significant because no matter when any given mechanic's lien comes into existence, it "relates back" to the "commencement" of the work of improvement. (Civ. Code, § 3134; *Connolly Development, Inc.* v. *Superior Court* (1976) 17 Cal.3d 803, 808 [132 Cal.Rptr. 477, 553 P.2d 637].) It would be anomalous indeed if the mechanics' liens which arose on a given project all related back to a time—delivery—which did not itself see the inception of *any* mechanic's lien rights. Because, under *Walker*, all liens relate back to the delivery date, it should also be the date when waivable lien rights at least *begin* to arise.

Moreover, use of the ordinary meaning of the word "furnished" is consistent with the context of California mechanic's lien law. (Cf. *Clean Air Constituency* v. *California State Air Resources Bd.* (1974) 11 Cal.3d 801, 814 [114 Cal.Rptr. 577, 523 P.2d 617].) Civil Code section 3110[4] sets out the lien rights of materials suppliers. It provides, in applicable part: "[M]aterialmen . . . furnishing materials . . . to be used or consumed in . . . a work of improvement shall have a lien upon the property upon which they have . . . furnished materials . . . for the value of such . . . materials furnished . . . ."

This language requires suppliers to show two things to "have a lien." First, they must "furnish materials . . . to be used" in a work of improvement upon some property. Second, the property must have had the materials furnished "upon" it.

The two requirements involve two different time frames. The first requirement is prospective—bearing on the reason the materials are supplied. The

---

[4]All statutory references are to the Civil Code unless otherwise indicated.

focus is on the materials. Just any materials will not do. They must be materials "to be" used in the improvement.

The second requirement is retrospective—focusing on what was actually done with the materials after they were supplied. This requirement has attracted judicial attention since Millard Fillmore was President (*Bottomly* v. *Grace Church* (1852) 2 Cal. 90, 91 ["The materials must . . . have been used in the construction of the building . . . ."]) and has been reiterated many times.[5]

There is a difference, however, between furnishing materials to a *subcontractor* and furnishing materials *upon a building*. In the former, all the supplier must do is "provide" the subcontractor with materials—something manifestly accomplished by delivering the materials. In the latter, the supplier must wait for someone to make use of materials already delivered.

If both requirements must be satisfied for a materials supplier to possess an enforceable mechanic's lien on property, one might ask whether any waivable lien rights can exist prior to actual incorporation of materials into the improvement. But a number of requirements must be satisfied before a mechanic's lien is *enforceable*, including giving a 20-day notice (§ 3114), timely recordation of a claim of lien (§§ 3115-3116), and timely filing of an action to foreclose the lien (§ 3144). Just because lien rights are not yet enforceable does not mean they are not yet waivable.

Mechanic's lien rights are inchoate, abstract, almost spectral creatures in California law. They *begin* to form when materials are delivered or work is performed, but must wait until the materials become a part of the property before they can actually haunt the owner. At what point, then, may they be exorcised? If, as *Walker* indicates, these ghosts can travel back in time to the date of delivery, then they should be capable of obliteration at that time as well.

---

[5]E.g., *Ensele* v. *Jolley* (1922) 188 Cal. 297, 300 [204 P. 1085] ("in order to entitle a materialman to a lien as against the owner of premises . . . the materials must . . . also have been used therein"); *Wilson* v. *Nugent* (1899) 125 Cal. 280, 284 [57 P. 1008] (lack of finding materials furnished were used in building "fatal" to judgment); *Roebling Sons Co.* v. *Bear Val. I. Co.* (1893) 99 Cal. 488, 490 [34 P. 80] (quoting *Bottomly*); *Silvester* v. *Coe Quartz Mine Co.* (1889) 80 Cal. 510, 513 [22 P. 217] (holding lien claimant could not recover for track-iron furnished for use in repairing mine but not actually used); *Holmes* v. *Richet* (1880) 56 Cal. 307, 310 (quoting *Houghton, infra*); *Houghton* v. *Blake* (1855) 5 Cal. 240, 240-241 ("to enable a material man to enforce a lien upon a building for materials furnished, it must be alleged and proved not only that the materials have been used in the construction of the building . . . ."); *Consolidated Elec. Distributors, Inc.* v. *Kirkham, Chaon & Kirkham, Inc.* (1971) 18 Cal.App.3d 54, 58 [95 Cal.Rptr. 673] ("materials must not only be furnished for, or delivered to the site of, the particular building, but must actually be used in the construction in order to sustain a mechanic's lien").

There are, however, two ostensibly contrary authorities. A treatise, 8 Miller and Starr, California Real Estate (2d ed. 1990) Mechanics' Liens, section 26:15, page 425, states: "The mechanic's lien attaches when the mechanic's materials are physically incorporated into the structure." Miller and Starr do not cite any authority for this statement. Rather, the statement appears to be the implication of the next sentence in their text, "A mechanic cannot impose a lien for materials which remain personal property and are not attached to the building as a fixture." Miller and Starr support this second sentence with a reference to section 26:9 of their text, which covers the subject of material suppliers' liens generally.

Section 26:9 says, "the material supplied must be attached to and incorporated into the project so that it becomes a fixture, and the supplier cannot have a lien if it remains personal property." (8 Miller & Starr, *supra*, § 26:9, p. 381, fn. omitted.) This sentence appears to be the basis of the statement about attachment at the time of physical incorporation. Miller and Starr support this sentence with a citation to a line of cases discussing whether certain items of personal property qualified for mechanic's liens. In none of the cases did the court confront the precise issue of whether delivery of items *to be used* in the work of improvement (i.e., were destined "to be" fixtures) gave rise to inchoate lien rights which might be waived prior to actual incorporation. Rather, the court was concerned with the nature of the item, i.e., whether it became a fixture or remained personal property.[6] Therefore the statement in Miller and Starr's text is not dispositive.

---

[6]See *Ogden* v. *Byington* (1926) 198 Cal. 151 [244 P. 332] (farming equipment used to construct irrigation ditches and do levee work in a rice field was not lienable because there was no permanent visible change in the surface of the land); *Jordan* v. *Myres* (1899) 126 Cal. 565, 570 [58 P. 1061] (hoisting machinery fixed to mine remained personal property); *Hamilton* v. *Delhi Mining Co.* (1897) 118 Cal. 148, 153-154 [50 P. 378] (mining equipment fixed to building subject to lien); *Cornell* v. *Sennes* (1971) 18 Cal.App.3d 126, 135 [95 Cal.Rptr. 728] (by repossessing air conditioning units, sellers elected to treat units as personal property and thereby waived right to mechanic's lien); *Howard A. Deason & Co.* v. *Costa Tierra Ltd.* (1969) 2 Cal.App.3d 742, 757 [83 Cal.Rptr. 105] ($35 worth of chlorine used in a swimming pool could not be classified as a permanent improvement and was not a "lienable item"); *Kruse Metals Mfg. Co.* v. *Utility Trailer Mfg. Co.* (1962) 206 Cal.App.2d 176 [23 Cal.Rptr. 514] ("bag house" sandblasting filtration system not a fixture); *Daniger* v. *Hunter* (1952) 114 Cal.App.2d 796, 798 [251 P.2d 353] ("sink unit" consisting of gas stove, kitchen sink, and refrigerator not a fixture because easily disconnected without damage); *Shelley* v. *Kofka* (1951) 107 Cal.App.2d 827, 830 [237 P.2d 984] (tackless carpet would not be fixture if it could be taken up without injury to house); *Cain* v. *Whiston* (1943) 58 Cal.App.2d 738, 745-746 [137 P.2d 479] (oil rig accessories and equipment not part of improvement and therefore not within lien); *Hammond Lumber Co.* v. *Gordon* (1927) 84 Cal.App. 701 [258 P. 612] (removable balconies were fixtures because nailed and bolted to building); *Moses* v. *Pacific Building Co.* (1922) 58 Cal.App. 90, 94 [207 P. 946] (electrical wiring, conduits and switchboards not within lien because there was no intention material should ever become permanently attached to building).

The other authority is dicta in the Supreme Court case of *Bennett* v. *Beadle* (1904) 142 Cal. 239 [75 P. 843]. *Bennett* held materials suppliers had no right to a lien under California's vessel lien statute[7] where they arranged for delivery of materials to common carriers in San Francisco who, in turn, delivered the materials to Coos Bay, Oregon, where the vessel was being constructed. In the process of so holding, the court discussed the mechanic's lien statute[8] and mentioned, in passing, that unless materials were "used in the building, they are not 'furnished upon' the same." (142 Cal. at pp. 242-243.)

This dicta does not require us to equate "furnishing" materials with their actual incorporation into a structure. The *Bennett* dicta refers to the second requirement in section 3110, namely that the material be "furnished upon" the work of improvement. The dicta merely requires the *eventual* incorporation of the materials into the structure for the materials to have been "furnished upon" it. It does not say what the words "furnished to" mean as used in the release prescribed in section 3262, and specifically whether lien rights which *potentially* arise out of material "furnished to" a subcontractor might be waived before the material is "furnished upon" the structure.

Moreover, reading the *Bennett* dicta to say "delivering" materials does not amount to "furnishing" them ignores the everyday meaning of the two words. The *Bennett* court itself was unable to describe the basic facts before it without equating furnishing with delivery. Twice within the first four sentences of the opinion the court said the materials suppliers in that case "furnished" materials for use in the construction of the vessel in a context which clearly meant delivery. (142 Cal. at p. 240.)

Thus with the delivery of the beams to the site, the lumber company had waivable mechanic's lien rights in those beams. We must now examine whether those potential lien rights were within the scope of the release.

### The Extent of the Release

### The Language

The release consists of three sentences. The first states the broad purpose of the release, i.e., "to release pro tanto any mechanic's lien . . . right the undersigned has on the job . . . to the following extent." The second *defines* in greater detail what it means to "release pro tanto . . . to the following extent," i.e., specifies the release "covers a progress payment for materials

---

[7]Then Code of Civil Procedure section 813, now Harbors and Navigation Code section 491.

[8]Then Code of Civil Procedure section 1183, now Civil Code section 3110.

furnished to" the subcontractor through a certain date. The second sentence also specifies what the release does not cover. It does not cover "any retention or items furnished after said date." The final sentence contains a caveat to verify evidence of payment before any reliance is put on the release.

It is the second sentence that controls the scope of the release. The first sentence only leaves the reader hanging: a right is being released pro tanto ("as far as it goes") "to the following extent." But to what extent?

The second sentence purports to answer the question. The release covers a progress payment for materials furnished through a certain date. It is tempting to stop with the phrase "covers a progress payment" and say that proves the release extends only as far as there is actual compensation for the materials furnished. This, however, ignores the balance of the sentence ("for materials furnished to [so and so] through [a certain date]").[9] The idea of a "progress payment" is that a certain amount of work has been done, i.e., work through a certain date. Taken as a whole, the second sentence assumes that the progress payment covers work through a certain date the same way the release covers the progress payment. Indeed, the scope of the progress payment itself is defined by reference to the date.

Moreover, not only does the release cover a "progress payment," but it expressly "does not cover any retention or items furnished *after* said date." (Italics added.) By saying one thing and excluding the other, the reader would naturally conclude that the release did cover items furnished *before* "said date."

There is also the problem of retention. If the release did not cover any retention at all, then one could conclude that it covered at least some items furnished "before said date." But the release does not say that. It does not say "does not cover any retention at all," or even "does not cover any retention, or items furnished after said date." A comma, necessary for the latter interpretation, is missing.[10]

Then again, the second sentence does not say "all" materials furnished through a certain date, just "materials" furnished. One might infer the release lets some materials furnished through the date escape its net.

---

[9] One is reminded of the story of the Victorian preacher who, disliking a popular women's hairstyle involving knotted hair at the top of the head—a "top knot"—began a sermon by admonishing his congregation with a quotation from the Bible: "top [k]not come down!" The complete quotation, of course, conveyed an altogether different meaning: "let him which is on the housetop not come down." (See Matthew 24:17.)

[10] The placement of commas can be important. Consider the distinction, sometimes employed by comedians, between, "What is this thing called love?" and "What is this thing called, love?"

But if some rights escape, why purport to release "any" mechanic's lien right the material supplier has on the job? If the release language actually contemplated *some* lien rights surviving, it could have spoken of "those lien rights covered by a progress payment . . . ." Moreover, it is the nature of a progress payment to reflect completion of a certain amount of work, and the natural *implication of the word is that it entails all work completed* (or materials furnished) through that point. Why not just say "payment for materials" and omit the reference to a date certain if some rights are to survive?[11]

The lumber company also makes an interesting argument concerning the use of the words "pro tanto" in the first sentence of the release. The argument is essentially this: if the words "pro tanto" were deleted from the release, the release would clearly cover all materials furnished, even if unpaid for. Therefore, if one reinserts the words "pro tanto," the release does *not* cover all materials furnished, even if unpaid for. The foundation of the argument is the rule against rendering any part of a statute surplusage. (E.g., *Palos Verdes Faculty Assn.* v. *Palos Verdes Peninsula Unified Sch. Dist.* (1978) 21 Cal.3d 650, 659 [147 Cal.Rptr. 359, 580 P.2d 1155].)[12]

The argument, however, is a non sequitur. "Pro tanto," we are told by the release form itself, means "for so much; for as much as may be; as far as it

---

[11] *Consumers Holding Co.* v. *County of L.A.* (1962) 204 Cal.App.2d 234 [22 Cal.Rptr. 106] suggests that lien rights can survive a release when the payment prompting the release does not include the work or materials giving rise to the rights, but, as explained below, does not help us in interpreting the scope of the release here.

In *Consumers Holding*, a plumber began work on an apartment building. As work progressed, he sent weekly invoices for progress payments, but made no effort to have the invoices cover the exact amount due. As progress payments were made, the plumber signed both releases on the payment checks and separate lien waivers which made specific reference to the last invoice. The job terminated when the state began eminent domain proceedings. At that time, the plumber had completed 70 percent of his contract, but had billed only 64 percent. The trial court allowed the plumber to testify he signed "merely as to the amounts billed."

Without elaboration the appellate court ruled the lien waivers were ambiguous "because reference is made to the particular invoice and then followed by words of acknowledgment of full payment or of general release." (204 Cal.App.2d at pp. 240-241.) Given the ambiguity, the court upheld the use of the plumber's testimony to establish he had not released his claim to a mechanic's lien for the amounts yet unpaid. *Consumers Holding* was decided before the Legislature prescribed the release here at issue, and involved the interpretation of an ambiguous private contract. It cannot tell us whether any rights survived *this* waiver.

[12] The lumber company's position is also supported by a brief reference in a practice handbook, California Mechanics' Liens and Other Remedies (Cont.Ed.Bar 1988) section 4.39, page 217: "By executing either a release or a waiver, a claimant gives up the rights to a mechanics' lien or a stop notice. Usually, these rights are released on a pro tanto basis, *i.e.*, to the extent of the payment, and usually only to the date of the document." This statement suggests "pro tanto" means "to the extent of the payment," but it also suggests it means "to the extent of the date of the document." The handbook does not appear to be particularly concerned with a situation, such as the present case, where the two meanings might yield

goes." It does not mean "not." It does not have the effect of rendering language the opposite of what it was.

Emphasis on the words "pro tanto" also begs the question. For so much as what? For as much as what may be? As far as what goes? When read in context (see *Johnstone v. Richardson* (1951) 103 Cal.App.2d 41, 46 [229 P.2d 9] [words of a statute "must be construed in context"]), the words "pro tanto" take their meaning from the second sentence of the release form, the scope of which, as has already been discussed above, twists and turns back on itself like a mobius strip—a figure which has no front or back. Put another way, the words "pro tanto" in the first sentence do nothing to blow away the fog that enshrouds the meaning of the second.[13]

Rather than try to twist actual language of the statute to make it fit, kicking and screaming, one of the two interpretations proposed by the parties, it seems more straightforward to call the language what it is— genuinely ambiguous on the point before us. We therefore turn to the legislative history of the release form for whatever light it might cast on the matter.

## The Legislative History

Mechanics' liens "relate back" to the time work first commences on a project. (§ 3134.[14]) The relation back feature of mechanics' liens is of particular importance to construction lenders. Lenders who have made loans after the commencement of work on a jobsite have found their loans subordinate to mechanics' liens arising out of work performed or material

different results. Nor does the handbook cite any authority for its statement. The brief reference in the handbook therefore does not help us determine the meaning of "pro tanto."

[13]Section 3262, subdivision (d) lists four different release forms to cover four different situations: when the claimant is about to receive a progress payment (subd. (d)(1)), when the claimant has already received a progress payment (subd. (d)(2)), when the claimant is about to receive the final payment (subd. (d)(3)), and when the claimant has already received final payment (subd. (d)(4)). The forms for the situations where the claimant has already received a progress or final payment include language telling the claimant the release is effective even if the claimant has not been paid. The form at issue here, however, has no such language. Does this imply pro tanto necessarily means "to the extent" of payment? No, but it does mean the claimant must actually be paid the progress payment referred to in the release for the release to be effective at all. There is a difference between the fact of receiving or not receiving a certain progress payment, on the one hand, and the precise work or materials that progress payment covers, on the other. The release form prescribed by subdivision (d)(1) is "conditional" on the progress payment clearing the bank. It is not conditional upon that progress payment actually including all materials "furnished to" a customer through the release date.

[14]Section 3134 provides, in applicable part: "The liens provided for in this chapter . . . are . . . preferred to any . . . other encumbrance upon the work of improvement and the site, which attaches subsequent to the commencement of the work of improvement . . . ."

delivered after trust deeds securing those loans were recorded because some work was performed or materials delivered before recordation. (E.g., *J. & W. C. Shull* v. *Brooke* (1930) 107 Cal.App. 88 [289 P. 885]; *Simons Brick Co.* v. *Hetzel* (1925) 72 Cal.App. 1 [236 P. 357]; *Hardy* v. *Frey* (1920) 49 Cal.App. 551 [196 P. 92].) Accordingly, lenders typically require releases of existing lien rights before they will make progress payments on construction loans. (Cf. *Santa Clara Land Title Co.* v. *Nowack & Associates, Inc.* (1991) 226 Cal.App.3d 1558, 1569 [277 Cal.Rptr. 497].)

In 1982, however, the ability of construction lenders to obtain valid releases of liens was undercut by *Bentz Plumbing & Heating* v. *Favaloro* (1982) 128 Cal.App.3d 145 [180 Cal.Rptr. 223]. *Bentz* construed Civil Code section 3262 to render *all* lien waivers null and void. (*Id.* at pp. 149-150.) The decision dried up construction loans and plunged construction lending in California into chaos.[15]

In response, Assemblyman Bill Lancaster introduced Assembly Bill No. 844 in February 1983, sponsored by the Associated General Contractors and Southern California Contractors Association. The bill amended section 3262 to create four kinds of waiver and release of mechanic's lien rights, and prescribed a form for each one. The release form employed in this case is found in subdivision (d)(1).

In examining the various reports prepared as Assembly Bill No. 844 wound its way through the corridors of Sacramento, we find no comment focusing on the precise extent of the conditional waiver set out in section 3262, subdivision (d)(1). But we do find material to support both readings of the statute proffered by the parties.

On the one hand, a letter from attorneys for a number of the construction industry groups who sponsored the bill stated, "The first waiver form (the Conditional Waiver) releases *all* lien rights upon payment to the Subcontractor . . . ." (This language appears to have been repeated in a consultant's report to the Assembly Judiciary Committee.) A staff comment found in another of the consultant's reports said, "The bill's source states that lien waivers are necessary in order to assure owners and lenders that subcontractors and materialmen with *potential* lien claims on their property

---

[15]Part of the legislative history material furnished by the parties to the trial court was a letter written on behalf of the Associated General Contractors of California, Associated General Contractors of San Diego, Southern California Contractors Association, and the Underground Contractors Association to Governor Deukmejian dated May 31, 1984. The letter pointed out *Bentz* "seriously impede[d] the cash flow of construction projects since the lender has always required lien release before making progress payments." It went on to describe the "situation" after *Bentz* as "chaotic."

have been paid by the prime contractor." A letter from the legislative representative of the State Bar supported the bill "because it makes the mechanic's lien rights waivable, within certain ground rules, after the laborer, subcontractor or materialman *provides* the services or goods." The author's statement to the bill said that "the first release (the conditional release) waives and releases the mechanics' or materialmen's lien upon payment . . . ." (Italics added throughout paragraph.) These statements all indicate that, as long as the payment described in the conditional waiver is actually made (i.e., the check does not bounce), all lien rights existing at the time, including those arising from a materials supplier having "provided" materials to a site, are covered by the waiver.

On the other hand, the Senate Insurance, Claims and Corporations Committee's digest of Assembly Bill No. 844 stated conditional waivers would "release any mechanic's lien, stop notice or bond right the claimant has on the job *to the extent of the progress payment.*" (Italics added.) (This comment was repeated a number of times throughout the legislative materials.) Moreover, the author's statement to Assembly Bill No. 844 also stated, "AB 844 codifies the *Bentz* case with respect to the conditional waiver and hopefully overrules the *Bentz* case with respect to the unconditional waiver."

We do not consider any of these bits and pieces dispositive. The most enigmatic is Assemblyman Lancaster's comment about "codifying" *Bentz* with regard to the conditional waiver. The comment is not elaborated upon. One could take it to mean that the material supplier only gives up rights to the extent they are strictly paid for. But not necessarily. It might also simply mean that the material supplier must get paid before any rights are waived, a reading supported by the caveat in the form that before any recipient relies on it, the recipient should "verify evidence of payment."

The problem in this case, of course, is that the lumber company *was* paid the payment mentioned in the form. The check for $24,187.09 was good. Any person wanting to rely on the release could have "verified" the evidence of payment to a fare-thee-well and still not have known that the payment did not fully compensate the lumber company for material that had already been delivered to the site.

The legislative history is thus no more conclusive than the legislative language. Consequently, we are now forced to interpret the release to make it reasonable, practical, and avoid absurdity.

### Reason, Practicality, and the Avoidance of Absurdity

In general, mechanics' liens have nothing to do with mechanics—that is, people who work on cars. In modern usage, the term is misleading. (See 44

Cal.Jur.3d, Mechanics' Liens, § 1, p. 36.) ■ The term derives from the older meaning of "mechanic"—meaning manual worker or artisan—which included such skilled construction workers as carpenters and masons. (See Webster's Third New Internat. Dict. (1986) p. 1400.)

Mechanics' liens are a peculiar legal remedy available to workers and suppliers in the construction industry. Such liens are specifically provided for in the California Constitution, which states: "Mechanics, persons furnishing materials, artisans, and laborers of every class, shall have a lien upon the property upon which they have bestowed labor or furnished material for the value of such labor done and material furnished; and the Legislature shall provide, by law, for the speedy and efficient enforcement of such liens." (Cal. Const., art. XIV, § 3.) No other creditor's remedy has such a "constitutionally enshrined status." (*Connolly Development, Inc.* v. *Superior Court, supra,* 17 Cal.3d at p. 808.) The remedy seeks to protect labor and materials contractors in the construction industry, whose risks are not as diffused as, and who are therefore typically more vulnerable than, other creditors. (*Id.* at pp. 826-827.)

■ It is thus fundamental that lien rights are a remedy available to workers and suppliers who have not been fully paid. If the release form prescribed in section 3262, subdivision (d)(1), covered only suppliers who had no claim for *further* payment for materials delivered through the release date, the form would release nothing that otherwise would not be released anyway. A materials supplier could still assert a given payment was not "for" materials furnished to a customer through the release date, contrary to the recitation of the second sentence of the release form. No potential disputes over whether a given progress payment covered certain work or materials would be resolved, and the parties would remain uncertain of their rights, including the relative priority of any mechanic's lien that might yet be filed. The reading urged by the lumber company would thus render section 3262, subdivision (d)(1), an absurdity. It would make the release nothing more than a glorified receipt. While the intent of the Legislature as to the precise scope of the conditional waiver release set forth in section 3262, subdivision (d)(1) is a bit murky, the general purpose of the statute is reasonably clear. Assembly Bill No. 844 was introduced in the wake of *Bentz* to provide for releases lenders and owners could *rely* on if a certain payment were indeed made. A handwritten comment on an Assembly Judiciary Committee worksheet, responding to the "Problem or deficiency in the present law which the bill seeks to remedy," stated: "Court findings [presumably the *Bentz* decision] made use of lien waivers in construction useless in paying sub contractors [*sic*], materialmen, etc."

If, as in this case, the payment specified in the release could be made and material suppliers were still able to assert mechanics' liens, the release

would be "useless" in paying material suppliers. No rights would be released that would not be released by virtue of the payment *anyway*.

Moreover, pegging the scope of the release strictly to the extent of payment rather than all work or materials furnished through a certain date is impractical. Lenders would need to physically monitor the progress of the work at the site in order to ascertain whether any given progress payment "covered" all the work and material which might potentially give rise to mechanic's lien rights. Unless every last piece of lumber were accounted for, lenders would be unable to be certain of the relative priority of their encumbrances—even after they had loaned the money for a progress payment.

In light of the foregoing, we decline to adopt the lumber company's interpretation of the release form prescribed by section 3262, subdivision (d)(1). (See *Gilles* v. *Department of Human Resources Development* (1974) 11 Cal.3d 313, 324, fn. 12 [113 Cal.Rptr. 374, 521 P.2d 110, 90 A.L.R.3d 970] ["all statutes should be interpreted to promote, rather than defeat, the general purpose of the law"].) The release covered *all* mechanic's lien rights which potentially existed as of the release date as long as the $24,187.09 payment was actually made.

CONCLUSION

While the text and statutory history of the release here are less than pellucid, there is only one interpretation that is workable. The other accomplishes nothing and gives no assurance that lien rights have been waived even if the payment specified in the release is made. A release should not be a weak stick which, if one leans on it, breaks and splinters in one's hand. Accordingly, we hold the release covered the glu lam beams. The judgment is affirmed.

Wallin, J., and Sonenshine, J., concurred.

Appellant's petition for review by the Supreme Court was denied August 27, 1992. Lucas, C. J., Mosk, J., and Panelli, J., were of the opinion that the petition should be granted.