Filed 8/30/24  Zinderman v. City of Los Angeles CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| DANA ZINDERMAN, | B329765 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. 22STCP00655) |
| v. | |
| CITY OF LOS ANGELES, | |
| Defendant and Respondent; | |
| BELMONT VILLAGE L.P. et al., | |
| Real Parties in Interest and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mary H. Strobel, Judge.  Affirmed.

Corin H. Kahn for Plaintiff and Appellant.

Hydee Feldstein Soto, City Attorney, Amy Brothers, Kathryn C. Phelan, Clarissa Padilla, Deputy City Attorneys; Best

Best & Krieger, Trevor L. Rusin and Ali Tehrani for Defendant and Respondent.

Armbruster Goldsmith & Delvac and Damon P. Mamalakis for Real Parties in Interest and Respondents.

_____

The City of Los Angeles (City) approved construction on Wilshire Boulevard in Westwood, where Belmont Village, L.P. (Belmont) plans to build a 176-room eldercare facility and Westwood Presbyterian Church (Church) plans to build a childcare facility (the Project).[1]  The Project is almost 90 percent residential and is adjacent to mass transit.  The trial court denied appellant Dana Zinderman's petition to set aside City's approval of the Project.  (Code Civ. Proc., § 1094.5.)

Substantial evidence supports City's determination that the Project qualifies as a transit priority project, allowing it to prepare a streamlined environmental assessment in lieu of other documentation required by the state Environmental Quality Act (CEQA).  (Pub. Resources Code, § 21155.)[2]  Section 21155 "reform[s] CEQA to encourage mixed use and mass-transit adjacent development."[3]  The record belies appellant's claims

_____

[1] Belmont and Church are the real parties in interest (RPI's).

[2] Undesignated statutory references are to the Public Resources Code.  Section 21155 was enacted by Senate Bill No. 375 in 2008.

[3] Darakjian, *SB 375:  Promise, Compromise and the New Urban Landscape* (2009) 27 UCLA Journal of Environmental Law & Policy 371, 385–386.

2

that the Project has "no nexus with transit" or is inconsistent with local plans and policies. We affirm.

## FACTS AND PROCEDURAL HISTORY

### Nature of the Project

Church owns a 1.62-acre property near the intersection of Wilshire and Westwood Boulevards. A church, administrative office, fellowship hall, preschool, and parking lot currently cover 95 percent of the site. RPI's plan to preserve the church and raze the other improvements to build the Project.

At the north end of the site, Belmont plans to build a 12-story, 176,580 square foot eldercare facility with 53 independent living units; 77 assisted living guest rooms; 46 memory care rooms; and amenities for residents. A parking lot now covers the area slated for the eldercare facility, which will have a fellowship hall fronting Wilshire Boulevard for Church's use.

At the south end of the site, Church plans to construct a two-story, 19,703 square foot building that includes a 10,238 square foot preschool; administrative offices; and multipurpose area. School enrollment will increase from its current 80 children to a maximum of 105. There will be surface and subterranean parking, and 70 spaces for bicycles.

### City's Administrative Decision

RPI's applied for Project approval under CEQA. City's planning department concluded that this is a transit priority project (TPP). After making a TPP determination, City decided that a Sustainable Communities Environmental Assessment (SCEA) would be used to streamline its environmental analysis.

The SCEA included various studies, including greenhouse gas (GhG) emissions and transportation impacts. The SCEA concluded that with mitigation measures, the Project would not

3

cause significant environmental impact. The SCEA was circulated for public comment. After a public hearing, it was adopted by City in May 2021. Appellant spoke against the Project. City denied appeals of its decision.

City approved the Project under an eldercare ordinance that facilitates construction of senior housing.[4] It allowed zoning deviations to increase building height and interior open space and reduce parking requirements and yard setbacks. City acknowledged its historical facilitation of high-rise construction on Wilshire, including a 24-story luxury condominium building next to the Project site.

## Zinderman Petitions for a Writ of Mandate

In February 2022, appellant filed a petition for a writ of mandate, alleging that City violated CEQA. The petition states that the Project does not qualify as a TPP; therefore, City should not have approved a SCEA for the Project. Appellant asked the court to set aside City's approval of the Project.

## The Trial Court's Ruling

The court wrote that substantial evidence supports City's findings that the Project is a TPP. It found no dispute that 90 percent of the Project is eldercare, rejecting Zinderman's claim that the facility's corridors, elevators, dining areas, community rooms, and service areas are not a " 'residential use.' " City's municipal code defines senior housing as dwelling units, common dining areas, and community rooms.

---

[4] In a related appeal, *Westwood Neighbors For Sensible Growth v. City of Los Angeles* (July 19, 2024, B329768) [nonpub. opn.], this court determined that RPI's are entitled to a permit under City's eldercare facility ordinance.

4

The court rejected Zinderman's claim that a TPP cannot include an eldercare facility, where residents lack the mobility of an average household. The court concluded that section 21155 does not differentiate between residential projects whose occupants can or cannot drive. Residents, visitors, and employees can make use of public transit near the facility.

The court found substantial evidence to support City's conclusion that the Project is consistent with open space and other zoning requirements in City's municipal code. It rejected claims that the Project impermissibly requires removal of a single-family residence, or is inconsistent with the sustainable communities policy. The Project is in a highly urbanized area, amid high-rise buildings, and is well served by public transit. City reasonably found that the removal of one house to build a two-story childcare facility will not negatively impact housing. The court determined that approving the SCEA was not a prejudicial abuse of City's discretion. It denied Zinderman's petition and entered judgment for City and RPI's.

## DISCUSSION

### Appeal and Review

We review appellant's CEQA claim under Code of Civil Procedure section 1094.5, which allows agency decisions to be challenged for a prejudicial abuse of discretion. (Pub. Resources Code, § 21168; *Sacramentans for Fair Planning v. City of Sacramento* (2019) 37 Cal.App.5th 698, 722.) "[A]buse of discretion is established if the court determines that the findings are not supported by substantial evidence in the light of the whole record." (Code Civ. Proc., § 1094.5, subd. (c); *id.*, subd. (b).) City's approval of a TPP and SCEA "shall be reviewed under the

5

substantial evidence standard." (Pub. Resources Code, § 21155.2, subd. (b)(7).)

We scrutinize the administrative record for substantial evidence to support agency findings. (*Topanga Assn. for a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506, 514.) We view the evidence "in the light most favorable to the agency's findings, drawing all inferences in support of those findings" (*Akella v. Regents of University of California* (2021) 61 Cal.App.5th 801, 814) and "resolve reasonable doubts in favor of the administrative findings and decision." (*Topanga*, at p. 514.)

City's findings "come before us 'with a strong presumption as to their correctness and regularity.' " (*Schreiber v. City of Los Angeles* (2021) 69 Cal.App.5th 549, 558.) " 'We may not substitute our judgment for the City's and reverse because we believe a contrary finding would have been equally or more reasonable.' " (*Walnut Acres Neighborhood Assn. v. City of Los Angeles* (2015) 235 Cal.App.4th 1303, 1312–1313.)

## Overview of the Sustainable Communities and Climate Protection Act

The Sustainable Communities and Climate Protection Act in Senate Bill No. 375 (Stats. 2008, ch. 728) "seeks to reduce GhG emissions by promoting growth patterns in high-density, mixed-use developments located around mass transit hubs, and thereby indirectly encourage people to drive less. The bill shifts the development emphasis from sprawl-inducing suburban development and planning to urban and metropolitan development and planning. The message that SB 375 clearly sends to public agencies, developers, and other stakeholders is that dense, transit-oriented, and mixed-use development is a critical goal for GhG emissions reduction and the collective good."

6

(Davidoff et al., *SB 375: Lion or Mouse?* (Mar. 2009) 32 Real Property Law Reporter, No. 2, p. 1.)  To meet this goal, Senate Bill No. 375 requires metropolitan planning agencies to regularly update regional plans to support development of transportation networks that reduce emissions.  (*Id.,* p. 2.)  Regional agencies work with the California Air Resources Board (CARB) to set emission targets and prepare a sustainable community strategy. (*Id.,* p. 3.)  CARB must determine if a sustainable strategy meets emission targets.  (Gov. Code, § 65080, subd. (b)(2)(J)(ii).)

Senate Bill No. 375 offers a streamlined CEQA process if a TPP is a sustainable communities project.  To qualify, a project must be "consistent with the general use designation, density, building intensity, and applicable policies specified for the project area" under the sustainable community strategy.  (§ 21155, subd. (a).)[5]  A TPP is reviewed through a SCEA, and subject to a public hearing.  (§ 21155.2, subd. (b).)  The SCEA is not required to reference, describe, or discuss growth-inducing impacts or the impact of vehicle trips generated by the project on global warming or regional transit networks.  (§ 21159.28.)

### Exhaustion of Remedies Requirement

Raising an issue in administrative proceedings lets agencies " ' " 'learn the contentions of interested parties' " ' " and

---

[5] A TPP "shall (1) contain at least 50 percent residential use, based on total building square footage and, if the project contains between 26 percent and 50 percent nonresidential uses, a floor area ratio of not less than 0.75; (2) provide a minimum net density of at least 20 dwelling units per acre; and (3) be within one-half mile of a major transit stop or high-quality transit corridor included in a regional transportation plan." (§ 21155, subd. (b).)

gives them an opportunity to act, making litigation
" ' " 'unnecessary.' " ' " (*Sierra Club v. City of Orange* (2008) 163
Cal.App.4th 523, 535.)  The " ' "exact issue" ' " must be presented
to an agency and objections " ' "must be sufficiently specific so
that the agency has the opportunity to evaluate and respond to
them." ' " (*Id.* at pp. 535–536.)

Exhaustion of remedies " 'is a jurisdictional prerequisite to
maintenance of a CEQA action.' " (*Covington v. Great Basin
Unified Air Pollution Control Dist.* (2019) 43 Cal.App.5th 867,
872.)  The petitioner must show (1) the alleged noncompliance
with CEQA was presented in public comments or at a hearing,
and (2) the party filing the CEQA action objected to the project in
public comments or at a hearing.  (*Id.* at p. 873; § 21177.)

## The Project Qualifies as a TPP

A TPP requires a residential use; density of 20 dwelling
units per acre; and proximity to a major transit stop or transit
corridor.  (§ 21155, subd. (b).)[6]  City concluded that the Project
qualifies as a TPP "because it contains more than 50 percent
residential use; provides a minimum net density greater than 20
units an acre; and is within 0.5 mile of a major transit stop or
high-quality transit corridor included in a regional transportation
plan."  Appellant does not dispute that the Project is in a transit
priority area.  As discussed below, substantial evidence supports
City's findings.

---

[6] Appellant argues that a TPP requires—beyond the
elements of section 21155—a nexus between the land use and the
likelihood its users will replace car trips with other
transportation.  She cannot rewrite the statute to add elements
the Legislature did not contemplate.

8

### a. Requirement of 50 Percent Residential Use

To qualify as a TPP, a project must "contain at least 50 percent residential use." (§ 21155, subd. (b).) City found that the eldercare facility is residential and encompasses some 90 percent of the Project. The record supports the finding. It shows that the total square footage of the new buildings is 196,283: Of this, 19,703 is the child education center and administration, and 176,580 is the eldercare facility.

In administrative proceedings, appellant's counsel effectively conceded the point. Counsel listed each existing and proposed structure, including the church sanctuary, pinpointing "Non-Residential" use at 27.4 percent. Counsel divided the rest into "Non-Conventional Residential" (assisted living or memory care) and "Conventional Residential" (independent living). By this measure, with over 70 percent of the Project being "residential," section 21155 is satisfied.[7]

On appeal, appellant claims that the childcare facility is 40 percent of the Project. The Project's square footage belies appellant's claim. Appellant's brief shows that childcare is 10,238 square feet in a project that is almost 200,000 square feet, i.e., 5 percent of the total.

### b. Eldercare Facilities Are Residential

Appellant claims that only "households" are a residential use. While agreeing that supportive living facilities "are forms of housing," appellant contends that the Project is not residential because it serves dependent elders, comparing it to a hotel or

---

[7] Because the record shows the Project is over 50 percent residential, we need not address whether it is "mixed-use." (See § 21159.28, subd. (d) [referring to "residential *or* mixed-use residential" projects].)

hospital. Appellant ignores that hotels and hospitals provide temporary beds, not permanency for seniors as they transition from private homes to residences that ease the burdens of daily life and reduce social isolation.

Respondents assert that appellant failed to raise the "households" claim in administrative proceedings. (*Sierra Club v. City of Orange, supra,* 163 Cal.App.4th at p. 535.) In written opposition submitted to City, counsel for appellant argued that eldercare "is not a multi-family residential project despite the fact that it is an allowable use in the R-5 Zone" and suggested that only condominiums or apartments qualify for TPP status. Counsel did not argue that "residential" means "household." Nonetheless, the claim to City that a TPP requires "multi-family" housing sufficiently preserved the claim that eldercare is not "residential."

As noted above, appellant's counsel conceded to City that the Project is largely "residential," whether conventional or non-conventional. (§ 21155, subd. (b).) However, counsel reasoned that the Project does not "resemble the multi-family residential land use contemplated in Senate Bill 375" and therefore does not qualify as a TPP.

Senate Bill No. 375 does not define "residential." Absent a definition giving a statute special meaning, or an inherent ambiguity, we give words "their ordinary, everyday meaning." (*Halbert's Lumber, Inc. v. Lucky Stores, Inc.* (1992) 6 Cal.App.4th 1233, 1238.) "Residential" covers conventional homes as well as facilities serving residents.[8] The Legislature defines "residential"

---

[8] The Merriam-Webster online dictionary defines "residential" as "used as a residence or by residents;" "providing living accommodations for students;" or "provided to patients

10

property as "any dwelling or unit that is intended for human habitation." (Civ. Code, § 1954.51, subd. (e) [Costa-Hawkins Rental Housing Act].) Senior housing easily satisfies dictionary and legislative definitions of "residential."

The Legislature would not have used a broad term like "residential" if it intended to limit Senate Bill No. 375 to "multi-family households." Senate Bill No. 375 does not distinguish between conventional and non-conventional residents. No authority suggests that housing is not residential if some residents need assistance with daily living activities, or has communal kitchens and dining rooms, or wide hallways. On the contrary, City's municipal code deems all types of eldercare to be "residential housing." (L.A. Mun. Code, § 12.03.) Moreover, the Regional Transportation Plan/Sustainable Communities Strategy (RTP/SCS) defines household as including a "person living alone in a housing unit" or "a group of unrelated people" sharing housing. We reject appellant's claim that housing for seniors is not "residential."

### Consistency With Regional Policy

A TPP must be "consistent with the general use designation, density, building intensity, and applicable policies specified for the project area." (§ 21155, subd. (a).) A project is

---

residing in a facility," e.g., "a residential treatment center." (<https://www.merriam-webster.com/dictionary/residential> [as of Aug. 21, 2024], archived at <https://perma.cc/Z9PT-46MU>.) The Oxford English Dictionary defines it as "Serving or used as a residence; in which one resides; providing accommodation in addition to other services." (<https://www.oed.com/dictionary/residential_adj1?tl=true> [as of Aug. 21, 2024], archived at <https://perma.cc/G8SV-4JJX>.)

consistent if it " ' " 'will further the objectives and policies of the general plan and not obstruct their attainment.' " ' " (*Save Livermore Downtown v. City of Livermore* (2022) 87 Cal.App.5th 1116, 1124 (*Livermore*).) Officials determine if a project, even if not perfect, is "compatible" or " ' "in harmony" ' " with the general plan; courts do not " 'micromanage these development decisions' " and defer to local findings " 'unless no reasonable person could have reached the same conclusion.' " (*Ibid.*; *Sequoyah Hills Homeowners Assn. v. City of Oakland* (1993) 23 Cal.App.4th 704, 717–720.)[9]

The applicable policies are established by The Southern California Association of Governments (SCAG), a planning organization for the County of Los Angeles. SCAG adopted the 2016–2040 RTP/SCS, a long-range plan affecting land use and transportation strategies to achieve GhG reduction goals of CARB. This includes promoting development of housing and jobs near existing transportation networks to encourage public transit use for residents and employees.

City characterized the Project site as being in an urban and city neighborhood. It is over 64 percent residential with high- and mid-rise towers, has retail space, is well-served by transit, and residents can walk or bicycle for their daily needs. It concluded that an eldercare facility "is consistent with the range

---

[9] Consistency with the general plan does not require that GhG emissions be "quantified," contrary to appellant's claim. Appellant cites *Center for Biological Diversity v. Department of Fish & Wildlife* (2015) 62 Cal.4th 204, 219–220, which acknowledges that emissions are global and are "as inevitable as population growth." Our Supreme Court then wrote that "efficiency is superior to a simple numerical" analysis because CEQA is not "a population control measure."

12

of residential densities contemplated by both the Urban and City Residential place types" and "consistent with the general use designation, density, building intensity, and applicable policies" of the RTP/SCS prepared by SCAG.

The record shows that the Project is within walking distance of services, entertainment, and commerce; is close to public transit; and is accessible. The general plan contemplates building heights ranging from 5 to 40 stories, meaning that the 12-story eldercare facility is within range. The Project "is located within one of the densest areas of development within the region." It "has an extensive transit network" with 21 transit lines operated by six agencies. At rush hour, some 170 bus trips pass nearby. The Project will be within walking distance of a light-rail transit line from downtown Los Angeles to the ocean. Under the RTP/SCS, it is in an area where high density development is encouraged.

Appellant did not refute the Project's consistency with the general plan or carry the burden "to *affirmatively show* there was no substantial evidence in the record to support the City's findings." (*California Native Plant Society v. City of Rancho Cordova* (2009) 172 Cal.App.4th 603, 626.) This requires setting forth "all of the evidence material to the City's finding, then show[ing] that that evidence could not reasonably support the finding." (*Ibid.*) Appellant has not done so.

Instead, appellant notes that few of Belmont's residents will drive, thereby generating less traffic than other types of development. RPI's estimate that only 20 residents will own cars. Appellant claims that residents will "remain within their housing" and opines that public transit use will be "virtually nonexistent." Appellant's unsupported (and ageist) claim fails. It

13

is equally reasonable to infer that residents who lack cars will walk or use public transit, as City concluded.

Appellant writes that Belmont's facility will provide "employment for hundreds of people working in three shifts, seven days each week, 24 hours each day." The record does not support her claim that the employees will shun public transit. Belmont told City that 40 percent of the employees at its existing facility in Westwood carpool or use public transit. City could reasonably find that the Project provides "job opportunities near transit." Belmont will encourage non-car modes of transportation.

Appellant asserts that the eldercare facility lacks a sufficiently dense " 'floor area ratio' " or FAR. Appellant subtracts 41 percent from the FAR encompassing common rooms, hallways, and service areas, counting only the space where residents sleep. Appellant further subtracts rooms for memory care and assisted living residents, reasoning that they will not use public transit. Appellant's math does not add up. The FAR applies only to projects containing 26 to 50 percent nonresidential uses. (§ 21155, subd. (b).) This project is 90 percent residential.

Substantial evidence supports City's conclusion that the Project is "consistent with the general use designation, density, building intensity, and applicable policies specified for the project area." (§ 21155, subd. (a).) The goal is to encourage urban concentration and discourage sprawl into suburban areas lacking public transit. An eldercare facility that replaces a surface parking lot and a preschool serving local residents, next to Wilshire Boulevard, fulfills City's goal of increasing density.

14

## Consideration of the Project's Impact

City must identify "all significant or potentially significant impacts" of the TPP requiring mitigation. (§ 21155.2, subd. (b)(1).) Appellant believes that City sidestepped "the State's emphatic goal to reduce greenhouse gas emissions from automobiles." However, if a proposed project meets the criteria of section 21155 (50 percent residential use, density of 20 or more dwelling units per acre, and proximity to public transit), City is not required to consider its impact on global warming. (§§ 21155.2, subd. (b)(1), 21159.28, subd. (a).)

Appellant did not show that the sustainable communities strategy for the area fails to satisfy state GhG reduction targets. (§ 21155, subd. (a).) City concluded that the Project would have a "Less Than Significant" GhG impact. Appellant fails to identify exactly how City's analysis is wrong. Because only 20 out of 176 residents are likely to own cars, the Project is not a large contributor to GhG.

Relocating the Project to the suburbs would require lengthier car trips for everyone, residents, visitors, and employees alike. Proximity to medical care at UCLA justifies placing elder housing in Westwood, as noted by one of City's commissioners. Employees would be compelled to drive if it were located in the hinterlands. Because the Project qualifies as a TPP, appellant's discussion of other, hypothetical uses (such as condos or apartments) need not be addressed.

## CONCLUSION

The issues raised by appellant do not justify judicial micromanagement of City's decision. (*Livermore, supra,* 87 Cal.App.5th at p. 1124.) The Project qualifies as a TPP, is compatible with the general plan, and there is no basis for

15

concluding that no reasonable person would have reached City's determination.  (*Ibid.*)  By approving the Project in a densely populated part of Los Angeles, on a major thoroughfare that is well served by buses and will be served by a subway, City is furthering the Legislature's efforts "to constrain suburban sprawl" and "encourage compact development" to reduce private vehicle use and reduce GhG emissions.[10]

### DISPOSITION

The judgment is affirmed.  Appellant will bear all costs on appeal.

NOT TO BE PUBLISHED.


LUI, P. J.

We concur:



ASHMANN-GERST, J.



HOFFSTADT, J.

---

[10] Darakjian, *SB 375:  Promise, Compromise and the New Urban Landscape, supra*, 27 UCLA Journal of Environmental Law & Policy at pp. 373, 379–380.