[No. B227825. Second Dist., Div. One. Nov. 8, 2012.]

THE PEOPLE, Plaintiff and Respondent, v.
RUBEN VERDUZCO, Defendant and Appellant.

**COUNSEL**

Karli Sager, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Marc A. Kohm and J. Michael Lehmann, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**JOHNSON, J.**—Defendant Ruben Verduzco was convicted of one count of possession for sale of a controlled substance (methamphetamine) in violation

of Health and Safety Code section 11378 (count 4), and one count of possession of an essential chemical sufficient to manufacture hydriodic acid or a reducing agent with intent to manufacture methamphetamine in violation of Health and Safety Code section 11383.5, subdivision (e) (count 5).[1] He contends (1) insufficient evidence supports his conviction for possession of an essential chemical "sufficient to manufacture hydriodic acid or a reducing agent with intent to manufacture methamphetamine," because he only possessed one of the chemicals necessary to make a reducing agent; (2) the court erred in instructing the jury by failing to define the meaning of a "reducing agent"; and (3) the court erred in imposing attorney fees without notice and a hearing pursuant to Penal Code section 987.8. We conclude that the statutory language requires possession of all constituents of a reducing agent, and reverse defendant's conviction on count 5.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### 1. The Shoestore and Search of Defendant's House

Police in Pacoima received information that a shoestore on Foothill Boulevard with a "3 for $20" sign was selling narcotics out of the store. The police put the store under surveillance.

On February 2, 2009, police saw Carlos Garcia ride to the store on a bike. After a short time in the store speaking with several men, Garcia came out of the store, retrieved something from the trunk of a parked Honda Accord, and returned to the shoestore. Shortly after that, Garcia left the store and rode off on his bicycle carrying a large white box.

Police stopped Garcia, and searched his person, a backpack he was carrying, and the box. Garcia's backpack contained red phosphorus; the box contained a glass flask with red phosphorus residue in the bottom.

A police search of the Honda Accord, the men in the shoestore, and the shoestore yielded 21.78 grams of cocaine and 33.61 grams of methamphetamine packaged in small baggies, a scale of the type commonly used for narcotics sales, empty baggies, a pay-and-owe sheet, and currency.

Police approached Garcia's house on Pinney Street, and observed defendant and a woman seated on a bed in the master bedroom. Police knocked on the front door, and defendant, wearing a T-shirt and boxer shorts, answered

---

[1] All statutory references herein, unless otherwise noted, are to the Health and Safety Code.

the door. With defendant's permission, police searched the house and found numerous items used to manufacture methamphetamine:

(1) A plastic bag containing red phosphorus;[2]

(2) A flashlight containing white oblong Tylenol pills;[3]

(3) A can of acetone;

(4) A piece of crystal-like material that can be used to "cut" methamphetamine;

(5) A plastic bag containing 0.15 grams of methamphetamine, found inside the pocket of defendant's pants hanging behind the door in defendant's bedroom;

(6) $2,353 in currency, found inside defendant's pants;

(7) 43 clear plastic baggies containing a total of 16.11 grams of methamphetamine found inside the pocket of a shirt hanging behind the door in defendant's bedroom;

(8) A digital scale; and

(9) A clear glass meth pipe found in defendant's bedroom between the wall and a bookcase.

### 2. The Process of Manufacturing Methamphetamine

Detective Frank Lyga testified that the manufacture of methamphetamine requires five steps. The first four steps produce the substance; the fifth step converts it to a smokable (crystal) form. Step 1 involves ephedrine extraction from cold tablets containing pseudoephedrine. Ephedrine is difficult to get, so methamphetamine labs purchase cold medications such as Sudafed. The pseudoephedrine in cold tablets is not water soluble. Denatured alcohol, acetone, and other solvents are used to break down the pseudoephedrine into ephedrine. The pill dissolves in the solvent, and the filler in the pill forms a solid at the bottom of the container. The liquid is strained off and after the solvent evaporates, pseudoephedrine remains.

---

[2] Red phosphorus, when combined with iodine, is used in the manufacture of methamphetamine.

[3] At the time of the search, police believed these pills were pseudoephedrine tablets, which are used in the manufacture of methamphetamine.

Step 2 converts the pseudoephedrine into methamphetamine by knocking off an oxygen molecule to create D-methamphetamine. This step requires an acid solution of 57 percent or higher; the preferred acid is hydriodic acid, which is heavily regulated and controlled. As a result, meth labs mix red phosphorus with iodine to produce an acid solution of 57 percent or greater. This solution requires heating and simmering for 12 to 72 hours.

The third step separates the waste product from the liquid solution and reduces the acid level. Sodium hydroxide, ice, and caustic soda are used. The ice is necessary because this step generates its own heat. An organic solvent (Freon, acetone, or denatured alcohol) is used to extract the methamphetamine molecules, which are suspended in the solvent.

In step 4, the methamphetamine is "salted out," converted from a liquid to a solid. This uses hydrogen chloride gas; such gas can be manufactured from battery acid, sulphuric acid, and rock salt. The gas is infused in the solvent mixture and the methamphetamine forms a solid. This solid is dried off.

The last step converts the methamphetamine to a crystal form by dissolving it in a solvent, such as acetone, and heating it until the solvent evaporates.

   3.   *Expert Testimony Concerning the Items Found in Defendant's Home*

In Detective Lyga's opinion, the red phosphorus, which was found in defendant's kitchen, was possessed for the purpose of manufacturing methamphetamine. However, not all of the other ingredients necessary for manufacturing methamphetamine were found at defendant's house. Police did not find iodine, a cooking vessel, or hydrogen chloride gas. Nonetheless, Detective Lyga believed the red phosphorus defendant possessed was for the purpose of manufacturing methamphetamine because, except for manufacturing or a chemistry laboratory, the only use for red phosphorus is the making of methamphetamine.[4] Further, it is common for the components of methamphetamine to be kept at different locations to evade law enforcement and competitors.

Detective Lyga believed that defendant was the organizer and financer of the operation based on defendant's use of the master bedroom and possession of the currency, and that defendant delegated other duties to Garcia.

---

[4] The legitimate uses of red phosphorus are the manufacturing of explosives, toothpaste, fertilizer, detergent, and the striker plates on matchbooks.

### 4. *Defense Case*

Defendant denied possessing the ingredients of methamphetamine or being involved in its manufacture or sale, and denied he knew how to manufacture methamphetamine.

Defendant did not know about the red phosphorus or acetone found in the house, and denied he owned any of the narcotics found. He claimed that he and Garcia took turns using the larger bedroom. The currency officers found was money that he received for the sale of a lathe and a tow truck.

### 5. *Rebuttal*

While police waited for defendant to answer the front door, they heard the sound of glass striking something. Defendant answered the door in his underwear, and the only clothing found in the house was the shirt and pants in the master bedroom.

## DISCUSSION

### I. *Sufficiency of Evidence of Possession of a Reducing Agent*

Defendant contends that because he did not possess iodine, an essential component (when combined with red phosphorus) of the 57 percent acid solution necessary to constitute a reducing agent within the meaning of section 11383.5, subdivision (e), his conviction on that count must be reversed. Respondent argues that the legislative history establishes that the Legislature was concerned with closing the "loophole" that existed in prior law that permitted meth labs to use ingredients other than hydriodic acid to make methamphetamine: if we adopt an interpretation that requires both constituents, we will thwart that purpose.

Section 11383.5, subdivision (e) provides in relevant part that "[a]ny person who possesses *essential chemicals sufficient* to manufacture hydriodic acid or a reducing agent, with the intent to manufacture methamphetamine, is guilty of a felony . . . ." (Italics added.) Defendant argues the use of the word "sufficient" in the phrase "essential chemicals sufficient to manufacture hydriodic acid or a reducing agent" means that to violate the statute, he needed to have both iodine and red phosphorus, the "essential" chemicals "sufficient" to manufacture a reducing agent for the purpose of manufacturing methamphetamine. The People contend that "sufficient" in the statute does not require that defendant possess both chemicals, but that he possess any chemical used in the manufacture of a reducing agent for the purposes of producing methamphetamine in a *quantity* sufficient for such manufacture.

### A. *Principles of Statutory Interpretation*

■ The interpretation of a statute is a question of law. (*Reno v. Baird* (1998) 18 Cal.4th 640, 660 [76 Cal.Rptr.2d 499, 957 P.2d 1333].) Our overriding goal is to effectuate the intent of the Legislature. (*Coalition of Concerned Communities, Inc. v. City of Los Angeles* (2004) 34 Cal.4th 733, 737 [21 Cal.Rptr.3d 676, 101 P.3d 563].) Thus, the first step in statutory construction is to examine the statutory language and give it a plain and commonsense meaning. We do not examine the language in isolation, but consider it in the context of the statutory framework as a whole in order to determine the purpose of the statute and harmonize various parts of the enactment. If the statutory language is clear, we must "generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend." (*Ibid.*)

If the plain language of the statute does not resolve the inquiry, as a second step we may turn to maxims of construction, " 'which serve as aids in the sense that they express familiar insights about conventional language usage.' " (*Mejia v. Reed* (2003) 31 Cal.4th 657, 663 [3 Cal.Rptr.3d 390, 74 P.3d 166], quoting 2A Singer, Statutes and Statutory Construction (6th ed. 2000) p. 107; see *Ailanto Properties, Inc. v. City of Half Moon Bay* (2006) 142 Cal.App.4th 572, 582–583 [48 Cal.Rptr.3d 340].) If the statutory language is ambiguous, meaning " 'susceptible to more than one reasonable interpretation' " (*Coburn v. Sievert* (2005) 133 Cal.App.4th 1483, 1495 [35 Cal.Rptr.3d 596]), we may consider other aids, including the statute's legislative history " ' "and the wider historical circumstances of its enactment," ' " as well as the public policy underlying the law (*Absher v. AutoZone, Inc.* (2008) 164 Cal.App.4th 332, 340 [78 Cal.Rptr.3d 817]).

■ If the meaning of the statute remains unclear after examination of both the statute's plain language and its legislative history, then we proceed to the third and final step of the interpretive process. We apply "reason, practicality, and common sense to the language at hand." (*Halbert's Lumber, Inc. v. Lucky Stores, Inc.* (1992) 6 Cal.App.4th 1233, 1239 [8 Cal.Rptr.2d 298].) The words of the statute should be interpreted "to make them workable and reasonable." (*Ibid.*) We will also consider the consequences that will flow from a particular statutory interpretation. " 'In determining what the Legislature intended we are bound to consider not only the words used, but also other matters, "such as context, the object in view, the evils to be remedied, the history of the times and of legislation upon the same subject, public policy and contemporaneous construction. [Citation.]" [Citation.]' [Citation.]" (*Ailanto Properties, Inc. v. City of Half Moon Bay, supra,* 142 Cal.App.4th at p. 583.)

B. *The Statute's Unambiguous Language Requires Possession of All Constituent Elements, Not Just Red Phosphorus or Iodine Alone*

■ To interpret the statute, we must look at the three words, "essential chemicals sufficient," and their relationship as a definitional phrase. We conclude this phrase requires possession of all chemicals necessary to make a reducing agent, not just one. First, the Legislature could have proscribed possession of elements in the singular by specifying "a chemical," but instead chose to refer to "chemicals." Second, the Legislature's use of both "essential" and "sufficient" in the statute indicates that the Legislature intended to assign different meanings to those words in the context of the statute. Thus, "essential" does not mean "sufficient," because such an interpretation would create a redundancy. Rather, "essential" means "indispensable" and refers to the required ingredients necessary to make a reducing agent, namely, red phosphorus *and* iodine. Finally, "sufficient" has a quantitative meaning requiring possession of both chemicals in amounts adequate to manufacture a reducing agent.

C. *The Legislative History of Section 11383.5, Subdivision (e) Does Not Undermine This Straightforward Interpretation*

1. *Legislative history of section 11383.5, subdivision (e)*

Previously, section 11383 addressed components of both methamphetamine and PCP. Section 11383.5 was added to the Health and Safety Code in 2006 and was created by the separation of section 11383 into two parts—section 11383.5 was added to address methamphetamine, while the PCP provisions remained in section 11383. (Sen. Com. on Public Safety, Analysis of Sen. Bill No. 1299 (2005–2006 Reg. Sess.) as introduced Feb. 16, 2006, p. 6.)

The Legislature recognized that hydriodic acid is a substance used by operators of methamphetamine labs and is the primary reducing agent in methamphetamine manufacture. Consequently, hydriodic acid was added to the list of controlled substances in 1993; however, operators of such labs substituted iodine. As a result, the Attorney General determined that controlling hydriodic acid by itself was insufficient, and the loophole in the law which permitted individuals to purchase chemicals to make hydriodic acid needed to be closed. (Assem. Com. on Public Safety, Analysis of Sen. Bill No. 419 (1995–1996 Reg. Sess.) as amended Mar. 28, 1995, pp. 1, 2.)

For that reason, in 1995, Senate Bill No. 419 (1995–1996 Reg. Sess.) added to section 11383 the provision that "[a]ny person who, with intent to manufacture methamphetamine . . . possesses hydriodic acid . . . is guilty of a felony . . . ." (Former § 11383, subd. (c)(2).) The bill also added language to former section 11383 subdivision (f), so that it read, "For purposes of this section, possession of immediate precursors sufficient for the manufacture of . . . hydriodic acid . . . shall be deemed to be possession of the derivative substance. Additionally, possession of essential chemicals sufficient to manufacture hydriodic acid, with intent to manufacture methamphetamine, shall be deemed to be possession of hydriodic acid." (Former § 11383, subd. (f).) (Stats. 1995, ch. 571, § 1, p. 4418.)

In 2002, a Court of Appeal held that former section 11383, subdivision (f), which provided that possession of red phosphorus and iodine was equivalent to the prohibited possession of hydriodic acid, created an impermissible mandatory presumption.[5] As a reaction to the Court of Appeal decision, in 2003 the Legislature amended former section 11383, subdivision (f) to provide, "Any person who possesses immediate precursors sufficient for the manufacture of . . . hydriodic acid . . . , with intent to manufacture methamphetamine, is guilty of a felony . . . ." Section 11383, subdivision (g) (the predecessor to § 11383.5, subd. (e)), was added in 2002 and provided, "Any person who possesses essential chemicals sufficient to manufacture hydriodic acid or a reducing agent, with intent to manufacture methamphetamine, is guilty of a felony . . . ." (Stats. 2003, ch. 619, § 1, p. 4725.)

In 2006, the current version of section 11383.5, subdivision (e) was enacted. (Stats. 2006, ch. 646, § 3, p. 5257.)

---

[5] *People v. McCall^* (Cal.App.). The decision was later reversed in *People v. McCall* (2004) 32 Cal.4th 175, 179, 181 [8 Cal.Rptr.3d 337, 82 P.3d 351] (*McCall*). *McCall* held that former section 11383, subdivision (f) created no mandatory rebuttable presumption, as no ultimate fact was to be presumed from a basic fact. Rather, the " 'shall be deemed' " language "simply created a rule of substantive law; to wit, the possession of red phosphorus and iodine with intent to manufacture methamphetamine was the legal equivalent of possession of hydriodic acid with intent to manufacture methamphetamine." (*McCall*, at p. 188, italics omitted.) As *McCall* explained, "Substantive due process allows lawmakers broad power to select the elements of crimes, and to define one thing in terms of another." (*Id.* at p. 189.) *McCall* held that the Legislature could elect to extend the prohibition on possessing hydriodic acid to include possession of the essential chemicals of hydriodic acid. (*Ibid.*)

## 2. *Analysis*

Although the plain meaning of the statute is sufficient to guide our analysis, we observe the legislative history does not compel a different result. The legislative history evidences an intent to criminalize possession only where *both* chemicals—red phosphorus and iodine—are possessed. Thus, former section 11383, subdivision (f) provided that "possession of immediate precursors sufficient for the manufacture of . . . hydriodic acid . . . shall be deemed to be possession of the derivative substance." (Former section 11383, subd. (f), as amended by Stats. 1995, ch. 571, § 1, p. 4418.) Further, the September 10, 2003 report of the Assembly floor stated the 2003 amendment "[c]larifies existing law to provide that possession of essential chemicals, such as red phosphorus and iodine, sufficient to manufacture hydriodic acid with intent to manufacture methamphetamine is a felony." (Assem. Conc. Sen. Amends. to Assem. Bill No. 158 (2003–2004 Reg. Sess.) as amended July 7, 2003, p. 1.) Indeed, former section 11383, subdivision (f) was upheld in *McCall, supra*, 32 Cal.4th 175, subsequent to the Legislature's 2003 amendments to the statute. *McCall* noted that former section 11383, subdivision (f), while not creating a mandatory presumption, "simply expanded the scope of section 11383[, subdivision] (c)(2) [(prohibiting possession of hydriodic acid with intent to manufacture methamphetamine)] to prohibit possession of red phosphorus and iodine with intent to manufacture methamphetamine." (32 Cal.4th at p. 189.)

Thus, it is of no consequence to our analysis that the legislative history also reflects that in connection with the 1995 amendments a goal on the part of some in the state Senate was to provide that possession of one element, iodine, "would be legally equivalent to possession of hydriodic acid" (Sen. Com. on Crim. Procedure, Analysis of Sen. Bill No. 419 (1995–1996 Reg. Sess.) Mar. 21, 1995, p. 6). In apparent contrast, the legislative history also demonstrates the view of some in the state Assembly that the goal of the statute was to "provide[] that possession of any essential chemicals, as well as any immediate precursors [of such chemicals], sufficient to manufacture methamphetamine, and/or other specified substances, shall be deemed to be possession of the substance." (Assem. Com. on Public Safety, Analysis of Sen. Bill No. 419 (1995–1996 Reg. Sess.) as amended Mar. 28, 1995, p. 3). In connection with the 2003 amendments, the legislative history indicates that it was intended to proscribe possession of essential chemicals, "including, but not limited to, red phosphorus *or* iodine, sufficient to manufacture hydriodic acid." (Assem. Com. on Public Safety, Analysis of Assem. Bill No. 158 (2003–2004 Reg. Sess.) as amended Mar. 18, 2003, p. 1, italics added.)

The bottom line, however, is that had it been the Legislature's intention to criminalize possession of only one of the components of hydriodic acid or a reducing agent, it could easily have done so by using the singular "chemical" and expressly stating that not all essential components need be present.

■   Accordingly, defendant's possession of red phosphorus alone did not constitute substantial evidence of his violation of section 11383.5, subdivision (e), and his conviction on that count is reversed.

## II.  *Instruction on "Reducing Agent"*

Defendant argues that the trial court erred in instructing with CALCRIM No. 2338 (possession of isomers or precursors with intent to manufacture controlled substance) because the instruction failed to define the meaning of "reducing agent," which he asserts has a particularized meaning not obvious from the language of the instruction, and prejudice resulted. Although his contention is technically mooted by our reversal of his conviction for possession of an element of a reducing agent, we exercise our discretion to review this issue of continuing public interest that we believe is likely to recur.[6] (*Hardie v. Eu* (1976) 18 Cal.3d 371, 379 [134 Cal.Rptr. 201, 556 P.2d 301].)

### A.  *Factual Background*

Following the presentation of the prosecution's case, the parties discussed jury instructions. Defendant's counsel indicated that CALCRIM No. 2338 as given was acceptable. CALCRIM No. 2338 as given provided, "To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant possessed an essential chemical sufficient[7] to manufacture hydriodic acid or a reducing agent; AND [¶] 2. When the defendant possessed that substance, he intended to use it to manufacture methamphetamine. [¶] Two or more people may possess something at the same time. [¶] A person does not have to actually hold or touch something to possess it. It is enough if the person has control over it or the right to control it, either personally or through another person."

---

[6] We also note that defendant forfeited this claim by failing to object to the instruction at trial. (*People v. Moore* (2011) 51 Cal.4th 1104, 1134 [127 Cal.Rptr.3d 2, 253 P.3d 1153].)

[7] We note that in light of our discussion above that the instruction incorrectly permits conviction on possession of only one constituent of a reducing agent.

B. *Analysis*

█ Section 11383.5, subdivision (g) defines a " 'reducing agent' " as "an agent that causes reduction to occur by either donating a hydrogen atom to an organic compound or by removing an oxygen atom from an organic compound."

█ In general, the terms of a statute do not require special definition. "[W]here the jury is instructed in the language of the pertinent statute, and the language is ' "plain and concise," ' and not 'couched in legal verbiage that is baffling to a juror' the giving of explanatory or specific instructions as to the legal effect of the wording is not mandatory." (*Thompson Pacific Construction, Inc. v. City of Sunnyvale* (2007) 155 Cal.App.4th 525, 547 [66 Cal.Rptr.3d 175].) However, the trial court has a duty to instruct, even in the absence of a request, on terms in an instruction that have a " ' " 'technical meaning peculiar to the law.' " ' " (*People v. Miller* (1999) 69 Cal.App.4th 190, 207 [81 Cal.Rptr.2d 410].) But " '[n]o such duty is imposed when the terms "are commonly understood by those familiar with the English language." ' " (*Ibid.*)

Thus, in *People v. Miller, supra,* 69 Cal.App.4th at p. 208, the court erred in failing to instruct on the meaning of " 'dangerous fireworks' " in section 12505 because the term had a technical meaning peculiar to the law. In *People v. Hudson* (2006) 38 Cal.4th 1002, 1011 [44 Cal.Rptr.3d 632, 136 P.3d 168], the court had a duty to instruct on the meaning of " 'distinctively marked' " in a prosecution under Vehicle Code section 2800.2 (fleeing pursuing officer's motor vehicle). Here, however, "reducing agent" is not a phrase that has a technical definition peculiar to the law: it is a scientific term derived from the laws of chemistry, not the Legislature or case law.

Furthermore, any error here was not prejudicial. Detective Lyga testified that a strong acid of 57 percent was needed for a reducing agent; the preferred acid was hydriodic acid; red phosphorus and iodine were mixed to produce a strong acid; this acid was used to strip off the oxygen molecule. As a result, a definition of "reducing agent" (which as the legislative history indicates is a generic term) was redundant and was not necessary for the jury to find a violation of section 11383.5, subdivision (e). As a result, even if the jury had been given the definition of "reducing agent," given the issue in the case (whether defendants possessed one of the components of the acid necessary for manufacture of methamphetamine) and the detective's testimony explaining how red phosphorus and iodine could be combined to make such an acid, it is not reasonably probable the result would have been different. (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

III. *Attorney Fees*

Defendant contends the court erred in requiring him to pay $2,668.94 in attorney fees because it did not conduct a noticed hearing at which he could present evidence of his ability to pay. Defendant further contends the claim is not forfeited because it is a challenge to the sufficiency of the evidence. (*People v. Viray* (2005) 134 Cal.App.4th 1186, 1217 [36 Cal.Rptr.3d 693].) Respondent concedes this point, and we agree.

A. *Factual Background*

At the time of their search of defendant's house, police recovered $2,353 in currency from defendant's pants. The money was forfeited to the Los Angeles Police Department pursuant to section 11470, subdivision (f). The probation report indicated that defendant earned $600 per month, paid $250 in rent, and made money doing odd jobs and recycling. Defendant had a third grade education, and was 59 years old. The probation report recommended a restitution fine, but did not recommend an attorney fee payment. At sentencing, the court ordered defendant to pay $2,668.94 in attorney fees pursuant to Penal Code section 987.8. No prior notice was given to defendant.

B. *Analysis*

██  Penal Code section 987.8 establishes the means for a county to recover some or all of the costs of defense expended on behalf of an indigent criminal defendant. (*Schaffer v. Superior Court* (2010) 185 Cal.App.4th 1235, 1245 [111 Cal.Rptr.3d 245].) Under subdivisions (b) and (c) of the statute, an order of reimbursement can be made only if the court concludes, after notice and an evidentiary hearing, that the defendant has "the present ability . . . to pay all or a portion" of the defense costs. (§ 987.8, subds. (b), (c), (e); see *People v. Amor* (1974) 12 Cal.3d 20, 29 [114 Cal.Rptr. 765, 523 P.2d 1173]; *People v. Phillips* (1994) 25 Cal.App.4th 62, 72–73 [30 Cal.Rptr.2d 321].)[8] If this finding is made, "the court shall set the amount to be reimbursed and order the defendant to pay the sum to the county in the manner in which the court believes reasonable and compatible with the defendant's financial ability." (§ 987.8, subd. (e).) If the attorney fee award is in error, remand is

_____

[8] Penal Code, section 987.8, subdivision (b) states: "In any case in which a defendant is provided legal assistance, either through the public defender or private counsel appointed by the court, upon conclusion of the criminal proceedings in the trial court, or upon the withdrawal of the public defender or appointed private counsel, the court may, after notice and a hearing, make a determination of the present ability of the defendant to pay all or a portion of the cost thereof. The court may, in its discretion, hold one such additional hearing within six months of the conclusion of the criminal proceedings. The court may, in its discretion, order the defendant to appear before a county officer designated by the court to make an inquiry into the ability of the defendant to pay all or a portion of the legal assistance provided."

permissible for the purpose of determining whether the defendant has the ability to pay attorney fees. (*People v. Flores* (2003) 30 Cal.4th 1059, 1068–1069 [135 Cal.Rptr.2d 63, 69 P.3d 979].)

" 'Ability to pay' " means "the overall capability" of the defendant to reimburse all or a portion of the defense costs. (§ 987.8, subd. (g)(2).) Ability to pay requires consideration of the defendant's financial position at the time of the hearing, his or her "reasonably discernible" financial position over the subsequent six months, including the likelihood of employment during that time, and "[a]ny other factor or factors which may bear upon the defendant's financial capability to reimburse the county." (§ 987.8, subd. (g)(2)(A)–(D).)

In calculating ability to pay, "the court [must] consider what resources the defendant has available and which of those resources can support the required payment," including both the defendant's likely income and his or her assets. (*People v. Smith* (2000) 81 Cal.App.4th 630, 642 [96 Cal.Rptr.2d 856]; see, e.g., *Conservatorship of Rand* (1996) 49 Cal.App.4th 835, 842 [57 Cal.Rptr.2d 119] [bank account]; *People v. Whisenand* (1995) 37 Cal.App.4th 1383, 1394 [44 Cal.Rptr.2d 501] [real property].)

While the statutory language does not mandate an express finding of an ability to pay, the statute contains a presumption that those sentenced to prison do not have the ability to pay. (Pen. Code, § 987.8, subd. (g)(2)(B); *People v. Lopez* (2005) 129 Cal.App.4th 1508, 1537 [29 Cal.Rptr.3d 586].) Thus, the court must make an express finding of unusual circumstances before ordering a state prisoner to reimburse his or her attorney. (*Lopez*, at p. 1537; cf. *People v. Phillips, supra*, 25 Cal.App.4th at p. 71 [where defendant admitted he would be earning $800 per month for two months prior to incarceration, implied finding of ability to pay supported by sufficient evidence].)

Where, as here, the defendant's objections to the fee order go to the sufficiency of the evidence to support the order, no objection need be made in the trial court. (*People v. Viray, supra*, 134 Cal.App.4th at p. 1217.) Thus, defendant did not waive his right to object to the lack of any finding concerning his ability to pay.

Further, on the merits, the record does not contain substantial evidence that defendant had the ability to pay because the court conducted no evidentiary hearing in the matter. Thus, we remand the matter for a determination under Penal Code section 987.8 of defendant's ability to pay attorney fees.

## DISPOSITION

Defendant's conviction on count 5 is reversed, and his conviction on count 4 is affirmed; the matter is remanded for a determination of defendant's ability to pay attorney fees under Penal Code section 987.8.

Mallano, P. J., and Chaney, J., concurred.