Filed 7/22/16  P. v. Greenwood CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C073647 |
| Plaintiff and Respondent, | (Super. Ct. No. 10F08037) |
| v. | |
| MARQUIS GREENWOOD, | |
| Defendant and Appellant. | |

Defendant Marquis Greenwood denies firing the gun that killed his accomplice, Tiekarian Troutman, during an attempted robbery.  Defendant admits he participated in the attempted robbery but claims the accomplice accidentally shot himself.

Defendant appeals following conviction for first-degree murder under the felony-murder rule and attempted robbery (Pen. Code, §§ 187, subd. (a), 189, 211/664; unless otherwise set forth statutory references that follow are to this code), as well as a separate robbery and carjacking of a different victim on a different day (§§ 211, 215, subd. (a)).

1

The jury also found defendant personally used a firearm during commission of murder and attempted robbery (§ 12022.53, subd. (b)) and personally and intentionally discharged a firearm during commission of the murder and attempted robbery (*id*. at subd. (c)), and committed the murder during commission of the attempted robbery (§ 190.2, subd. (a)(17)).

On appeal, defendant contends (1) the trial court erroneously answered jury questions about causation for felony murder; (2) the court erred by failing to clarify an ambiguous question by the jury regarding aiding and abetting; and (3) the court improperly ordered defendant to pay attorney fees for the public defender without a hearing on ability to pay. The Attorney General correctly concedes the third point, but the parties disagree on the remedy. We remand to the trial court for a hearing on ability to pay attorney fees, but we otherwise affirm the judgment.

FACTS AND PROCEEDINGS

A.     *The Prosecution Case*

The robbery and carjacking incidents (Counts 3 and 4) happened on December 20, 2010, a week before the December 27, 2010, murder and attempted robbery (Counts 1 and 2). Troutman's girlfriend Shayana Hollis testified about the events of both dates and told the jury she was charged as a codefendant in the murder and attempted robbery and entered a plea to voluntary manslaughter and was serving a 12-year sentence.

On the evening of December 20, 2010, 19-year-old defendant (nicknamed Go-Go) was standing on a sidewalk with his friend, 18-year-old Troutman, and Troutman's girlfriend (16-year-old Hollis) and brother (17-year-old Lakquan Solomon). Hollis testified that a man (victim James Reed) pulled up in a white PT Cruiser and got out of his car. Solomon spoke to the victim, and the two walked off together, while the others stayed behind. Solomon lit the victim's cigarette and suddenly hit the victim, who fell down, unconscious. One of the males removed items from the victim's pockets, and

2

Hollis removed car keys that were under the victim.  Defendant drove the group away in the victim's car.  Defendant later left to meet a girl.  The others continued driving around, stopping while Troutman committed three robberies of women on the street, firing his gun at one victim who chased him; the court admonished the jury to consider this evidence only to show the relationship between the witness and Troutman and to evaluate the witness's credibility.

On December 27, 2010, defendant, Troutman, and Hollis drove around, planning a robbery.  Around 6:00 p.m., defendant parked in front of Deluxe Market, a small store on E Street close to downtown Sacramento.  Hollis "scoped out" the place but did not go inside.  Troutman said he was going to grab the money, and defendant would carry the (only) gun.  But when defendant and Troutman got out of car and approached the store wearing ski masks, Troutman had the gun in his hand -- the same gun he used a week earlier.  Hollis stayed in the car.  Less than three minutes later, she heard the gun go off but could not see what was happening inside the store.  Through the car's rear view mirror, she saw defendant and Troutman run out of the store.  One of them tripped and fell but got up, then they stumbled and fell together.  Defendant got into the driver's seat and threw the gun in Hollis's lap.  Troutman got in the back and said, "you shot me, bitch."  Defendant replied, "I'm sorry, bro."  Hollis asked what happened, and defendant said there was a scuffle between "the guy" and Troutman, who dropped the gun and ran, and defendant picked up the gun and tried to turn and shoot the lady but ended up shooting Troutman in the neck.

In the back seat, Troutman sent a text message to his father and others saying, "I just got shop [sic] by Go-Go [defendant's nickname], I love you, so I'm sorry, I love all of you," with an asterisk and signature "Free Lil Bro" -- an apparent reference to Solomon who was in custody for the Reed incident.

Defendant dropped off Troutman and Hollis at a medical clinic.  Hollis initially told medical personnel, Troutman's father, and the police, that Troutman had been shot in

3

a drive-by shooting -- which she admitted at trial were lies. After a police detective reported that Troutman had died, Hollis gave different stories but eventually admitted the truth, including that she was involved in planning the robbery and had gone inside the market to check for video cameras.

Troutman died in the hospital during surgery, from a gunshot wound from a .22 caliber bullet, which entered the left front neck above the left collar bone and travelled front to back and somewhat downward into the left upper chest cavity and very slightly to the right, and ended up on the back inside part of his chest cavity. The forensic pathologist opined this was an "apparent" distant range entrance wound, meaning the gun was at least a couple of feet away from the victim, but the pathologist did not have access to the victim's clothing and was assuming the victim was wearing a standard shirt that would not have gotten in the way of the bullet. If the bullet passed through clothing, the distance may have been intermediate range, i.e., between maybe four inches to maybe two or three feet.

The store owners, Kuldeep Kaur and her husband Satnam Singh, testified. Kaur was behind the cash register when two masked men entered. The taller male (defendant) got behind the counter with her and demanded money, while the other stood in front of the counter pointing a gun at her. She did not comply, and the taller one told the gunman two or three times to "shoot her." She was scared, sat down, and yelled for her husband, who emerged from the stockroom with soda bottles. The two males ran from the store. Kaur told her husband not to pursue them because they had a gun. When the perpetrators were gone, Kaur and her husband called the police and tried to go outside, but the door was stuck. Kaur testified she did not hear a gunshot, and the men did not take anything from the store.

Singh testified he heard his wife scream, came out of the back room holding large soda bottles and, from a distance of two feet, threw one at the men, who were running towards the front door. He ran after them but did not struggle with them and was about

4

two feet from them when they ran out of the store, slamming the door so hard that it got stuck. He was trying to open the door when he heard a loud noise. He never saw a gun. After the men left, Singh later went outside to fix the door and found a mask and watch on the sidewalk outside the door.

Singh's trial testimony, with a Punjabi interpreter, differed from his earlier police interviews without an interpreter. Singh told police he had grabbed one of the men and got his mask and watch. Singh testified at trial that he thought he had grabbed one of the men and did tell the police he took off one of the hats, but he might have said that out of nervousness.

Troutman's DNA was on the ski mask recovered at the scene.

Police arrested defendant the day after the incident and interviewed people from the house where he had been staying. Rozendo Davila first denied knowing or seeing defendant, then said defendant said he was tussling with "the Arab" but slipped and got his partner. At trial, Davila, who was then serving a prison sentence for pimping and lewd acts and had prior convictions for drug offenses, testified defendant said he tried to rob a liquor store and accidentally shot his friend who was "flipped" over in a tussle with the store clerk. On cross-examination, Davila agreed he told the police what defendant said after the police insinuated that if Davila was lying to protect defendant, the police might suspect Davila, who was then on parole, was involved in the shooting.

The police recorded an interview with Derek Johnson, who gave his name and then said, "I don't know nothing." The detective said the others in the house all readily admitted that defendant talked about the shooting and said he "fucked up" during a robbery. Johnson said he only heard defendant say he "screwed up." The detective said the only reason he could figure for Johnson to lie was that Johnson was hiding something. Johnson then said he was "sorry for lying," and defendant said he and his partner had just robbed somebody and his friend was struggling with "the dude" and "he accidently [sic] shot his friend." At trial on a bench warrant after failing to obey the subpoena, Johnson,

5

who was then on probation, testified he had never been called as a witness, was scared, and did not want to be labeled a snitch. Johnson alternately testified he did, did not, and did not recall telling the police that defendant said anything about accidentally shooting his friend during a robbery, and Johnson also said he told the police what they wanted to hear because they said they would charge him for the crime.

Tammi King told police defendant said he "fucked up" and "the nigger ended up getting in the way, I popped him[.]" At trial, King testified defendant said his friend was "into it" with the store man, and defendant started shooting as he was leaving but his friend got in the way. King admitted she had been involved with the criminal justice system since 1996 for theft offenses, drugs, and lying to police, and had a 2006 conviction for a firearm offense.

B.  *The Defense Case*

Defendant testified at trial. Regarding the December 20th incident, he said he was just hanging out, had no idea Solomon was going to hit Mr. Reed, did not see it happen, and all he did was drive Reed's car.

Regarding the December 27th matter, defendant admitted he actively participated in the attempted robbery. They discussed doing a robbery to get money for a hotel room from which Hollis could work as a prostitute. They decided to rob the Deluxe Market, a small store. Hollis got out of the car and "cased" the area, came back and said there was only one small woman in the store at the cash register, so defendant thought it would be quick and easy to get money from her. Defendant and Troutman went into the store with their "beanies" with eyeholes pulled down, with Troutman holding the gun. Defendant went behind the counter. Troutman stayed in front of the counter pointing the gun at the lady. Defendant asked the woman for the money. She screamed, picked up a phone, and hid under the counter. Defendant did not recall telling Troutman to shoot her, but he was under the influence of marijuana and nervous. A man came out of the back room,

6

surprising defendant, and threw something at them.  Defendant ran for the exit.  He felt somebody running behind him but was not sure whether it was his partner or Singh.  At the door, defendant slowed a bit and Troutman, who had been running full speed behind defendant, stumbled over the back of defendant's heels, did "some type of somersault or some type of roll on the ground.  That's when the gun went off.  And he bounced right back up" with the gun still in Troutman's hand.

Back in the car, Troutman still had the gun.  He said, "I'm shot, bitch," and defendant said he was sorry because he felt Troutman would not have been shot if defendant had not run out of the store like a chicken and left Troutman.

Defendant denied telling anyone that he shot someone.

The jury found defendant:  guilty on Count 1, first degree murder and found true that he personally used a firearm and intentionally and personally discharged a firearm, and that he committed the murder while engaged in committing attempted robbery; guilty on Count 2, attempted robbery, and found he personally used a firearm and intentionally and personally discharged a firearm; guilty on Count 3, the Reed robbery; and guilty on Count 4, the carjacking.

The  trial court sentenced defendant to life without the possibility of parole for the murder, plus a determinate term of 29 years -- 20 years for the gun, three years (stayed) for the attempted robbery, nine years for carjacking, and five years (stayed) for the Reed robbery.  The court also ordered defendant to reimburse the public defender's office $3,175.

DISCUSSION

I

*Jury Questions on Felony Murder*

Defendant contends the trial court's answers to jury questions during deliberations improperly allowed the jurors to find him guilty of first degree murder under the felony-

7

murder rule even if they found he never had possession of the gun and Troutman accidentally shot himself. We need not resolve defendant's argument about the scope of the felony-murder rule, because the jury necessarily rejected the defense theory that Troutman shot himself, by unanimously finding true the section 12022.53 allegations that defendant personally used and intentionally and personally discharged the gun during the attempted robbery.

*Background*

Before deliberations began, defendant sought modified jury instruction stating the felony-murder rule did not apply if the jury believed defendant's version that Troutman accidentally shot himself. The trial court denied the request and instead instructed with CALCRIM No. 540A:

"The defendant is charged in Count 1 with murder, under a theory of felony murder. [¶] To prove that the defendant is guilty of first degree murder under [the felony murder] theory, the People must prove that:

"1. The defendant attempted to commit robbery;

"2. The defendant intended to commit robbery;

"AND

"3. While attempting to commit robbery, the defendant caused the death of another person.

"A person may be guilty of felony murder even if the killing was unintentional, accidental, or negligent. [¶] . . . [¶] It is not required that the person killed be the intended victim of the felony."

During deliberations, the jury sent Question No. 1 to the judge: "Under 540A. #3 is 'cause' the physical act of shooting the weapon or just being a[n] active participant in attempted robbery and as resulted in the death of a human being! [sic]" The handwritten

note shows the jury foreperson first wrote "and as a result causing the death of a human being," but changed it.

After conferring with counsel, the trial court answered:

"Causation is defined as follows: (240)

"An act causes death if the death is the direct, natural and probable consequence of the act and the death would not have happened without the act. A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all the circumstances established by the evidence.

"The physical act of shooting a weapon could be a cause based on your factual findings. Or, you may find that murder liability attaches when the defendant or other accomplices actively participate in the events causing death."

The jury later asked (in question number 6): "Under sec. 187(a) []first degree murder of Tiekarian Troutman, can defendant Marquis Greenwood be found guilty if Marquis Greenwood never touched the gun, and Tiekarian Troutman accidently [sic] shot himself?" The word "himself" was underlined twice.

Over defense objection that felony-murder applied only if defendant fired the gun, the court told the jurors: "Yes. If you find that the defendant actively participated in the events that caused the death; in other words, if the Defendant actively participated in the events surrounding the discharge of the gun."

The jury found defendant guilty of first degree murder and attempted robbery and also found he personally used a firearm and personally and intentionally discharged a firearm during commission of the murder and attempted robbery.

*Analysis*

Even assuming for the sake of argument that felony-murder would be inapplicable if Troutman accidentally killed himself, other aspects of the verdict prove the jury rejected that factual theory and instead found defendant "personally" used and

9

"personally" discharged the gun for the section 12022.53 firearm enhancements. Those enhancements do not impose vicarious liability to aiders and abettors except in the criminal street gang context, which is not at issue here. (§ 12022.53, subd. (e); *People v. Garcia* (2002) 28 Cal.4th 1166, 1171; *People v. Yang* (2010) 189 Cal.App.4th 148, 155.)

Where a jury is presented with both a valid and an invalid theory, "[s]ometimes it is possible to determine from other portions of the verdict that the jury necessarily found the defendant guilty on a proper theory." (*People v. Guiton* (1993) 4 Cal.4th 1116, 1130.) If the inadequacy is legal rather than factual, reversal is required "absent a basis in the record to find that the verdict was actually based on a valid ground." (*Id.* at p. 1129.)

*People v. Chun* (2009) 45 Cal.4th 1172 found error in jury instructions that permitted the defendant to be convicted of second-degree murder on a felony-murder theory without requiring a finding of a valid theory of malice. (*Id.* at pp. 1201, 1204.) The Supreme Court said, "If other aspects of the verdict or the evidence leave no reasonable doubt that the jury made the findings necessary for conscious-disregard-for-life malice, the erroneous felony-murder instruction was harmless." (*Id.* at p. 1205.) The felony murder instructions in that criminal street gang case required the jury to find that the defendant had the specific intent to commit the underlying felony of shooting at an occupied vehicle. (*Ibid.*) The court also instructed that, in order to find defendant committed that crime, the jury had to find willful and malicious discharge of the firearm at the vehicle. (*Ibid.*) Thus, any juror who relied on the felony-murder rule necessarily found that the defendant willfully shot at an occupied vehicle. The undisputed evidence showed the vehicle shot at was occupied by three persons, each of whom was hit by multiple gunshots fired at close range from three different guns. "No juror could have found that defendant participated in this shooting, either as a shooter or as an aider and abettor, without also finding that defendant committed an act that is dangerous to life and did so knowing of the danger and with conscious disregard for life -- which is a valid

10

theory of malice.  In other words, on this evidence, no juror could find felony murder without also finding conscious-disregard-for-life malice.  The error in instructing the jury on felony murder was, by itself, harmless beyond a reasonable doubt." (*Ibid*.)  The Supreme Court nevertheless remanded for the Court of Appeal to determine whether other errors were prejudicial.  (*Ibid*.)

Here, the court instructed the jurors to find whether the prosecution proved that defendant personally used a firearm, and someone personally uses a firearm "if he intentionally does any of the following:  [¶]  1.  Displays the weapon in a menacing manner;  [¶]  2. Hits someone with the weapon;  [¶]  OR  [¶]  3. Fires the weapon."  The court also instructed that to find true the allegation about discharge of a firearm, the jury must find the prosecution proved that "1.  The defendant personally discharged a firearm during the commission of the crime;  [¶]  AND  [¶]  2.  The defendant intended to discharge the firearm."  The jury returned verdicts finding defendant "personally" used a firearm and "intentionally and personally discharged" a firearm.

Thus, the verdict proves the jury rejected defendant's testimony that Troutman shot himself.

Defendant argues the true findings on the firearm allegations prove nothing, because the jury may have found that defendant "personally" discharged the gun by "aiding and abetting" Troutman's discharge of the gun.  We next reject that contention.

II

*Jury Question on Aiding and Abetting*

Defendant argues the trial court erred, and defense counsel rendered ineffective assistance, by failing to clarify an ambiguous jury question about aiding and abetting. Defendant argues the court's answer could have misled the jury into applying aiding and abetting principles to find true the allegations that defendant personally used a gun and personally and intentionally discharged a gun -- i.e., that defendant never touched the gun

11

but personally used a gun by aiding and abetting Troutman in Troutman's possession of the gun.

Defendant acknowledges he forfeited the matter by failing to raise it in the trial court. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1193), so he claims ineffective assistance of counsel. We reject the contention.

*Background*

During deliberations, the jury questioned the court: "Does section 400 - apply to all counts of jury instructions (aiding and abetting) or only to the specific violation penial [sic] code stated?"

CALCRIM No. 400 had instructed the jurors: "A person may be guilty of a crime in two ways. One, he or she may have directly committed the crime. I will call that person the perpetrator. Two, he or she may have aided and abetted a perpetrator, who directly committed the crime. [¶] A person is guilty of a crime whether he or she committed it personally or aided and abetted the perpetrator." The court had also instructed with CALCRIM No. 401: "To prove that the defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that: [¶] 1. The perpetrator committed the crime; [¶] 2. The defendant knew that the perpetrator intended to commit the crime; [¶] 3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime; [¶] AND [¶] 4. The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime. [¶] Someone *aids and abets* [orig. italics] a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime. [¶] . . . [¶] [T]he fact that a person is present at the scene of a crime or fails to prevent the crime does not, by itself, make him or her an aider and abettor."

12

The court had also instructed the jury with CALCRIM No. 1603: "To be guilty of robbery or attempted robbery (Counts 2 and 3) as an aider and abettor, the defendant must have formed the intent to aid and abet the commission of the robbery before or while a perpetrator carried away the property to a place of temporary safety. . . ." This instruction did not mention the carjacking.

In discussing the jury question with counsel, the trial court concluded "penial" was a misspelling of "penal," and said, "I don't think we stated any particular Penal Code section in aiding and abetting." Defense counsel said, "We have the special aiding and abetting for robberies that were limited to Counts 2 and 3. I think that's 403. . . ." The prosecutor said, "It's 1603, the one we added. But 400 is, yes, the all encompassing aiding and abetting CALCRIM that applies to all crimes to which you aid and abet." The court stated, "I think the answer is yes." Defense counsel said, "And is that -- that's the -- that's the total question, does it apply to all counts or only to specific?" The court said, "It says [']does Section 400 apply to all counts of jury instructions, and in parentheses aiding and abetting, or only to the specific violation Penal Code stated?['] [¶] Aiding and abetting applies to all crimes." Defense counsel agreed and said the answer should be yes, it applies to all. The prosecutor agreed and suggested "Perhaps they asked that because some other CALCRIMS are limited to certain counts and they just wanted to be sure." Defense counsel said, "Yeah. Maybe reconciling 403 and 1603, which is specifically limited."

The trial court accordingly answered the jury: "In response to Question No. 2: Yes, it applies to all crimes."

*Analysis*

To prevail on his fallback claim of ineffective assistance of counsel, defendant bears the burden to show (1) that trial counsel's performance fell below an objective standard of a reasonably competent attorney, and (2) that there is a reasonable probability

13

defendant would have obtained a more favorable result absent counsel's shortcomings. (*Strickland v. Washington* (1984) 466 U.S. 668, 688 [80 L.Ed.2d 674]; *People v. Cunningham* (2001) 25 Cal.4th 926, 1003.)

Defendant here meets neither test. He argues section 1138 (further instructions during deliberations) requires the trial court to clear up any instructional confusion expressed by the jury (*People v. Gonzalez* (1990) 51 Cal.3d 1179, 1212 (*Gonzalez*), superseded by statute on other grounds as stated in *In re Steele* (2004) 32 Cal.4th 682, 691), and trial counsel was deficient in not asking the court to "make inquiry" of the jury's ambiguous question. Defendant argues it is inconceivable that competent counsel would want the jury to remain confused. Defendant assumes trial counsel knew based on the first question about "cause" that the jury had not concluded defendant was the shooter.

However, *Gonzalez* said section 1138 imposes a duty on the court to help the jury understand the legal principles it is asked to apply. (*Id*. 51 Cal.3d at p. 1212.) But this does not mean the court must always elaborate on the standard instructions. (*People v. Beardslee* (1991) 53 Cal.3d 68, 97.) The court has discretion to determine what additional explanations suffice to answer the jury's question, and where the court's response is clear and correct, the court has properly exercised its discretion. (*People v. Smithey* (1999) 20 Cal.4th 936, 1009 (*Smithey*).)

Here, trial counsel obviously did not think the jury was or would remain confused, and trial counsel's interpretation of the jury's question -- shared by the trial court and the prosecutor -- was reasonable and did not fall below an objective standard of reasonableness.

Second, defendant does not demonstrate prejudice. He argues: "It is all too likely that the jury believed that all the charges and allegations in this case were 'crimes' and did not understand the difference between substantive offenses and special allegations."

14

Defendant supposes the jury may have found he "personally" used and discharged the gun on an "aiding and abetting" theory.

However, the jury was instructed that the firearm "allegations" were not "crimes" in CALCRIM No. 251: "The *crimes* and other allegations charged in this case require proof of the union, or joint operation, of act and wrongful intent. [¶] For you to find a person guilty of the *crimes* in this case of *murder, attempted robbery, robbery, or carjacking* as charged in *Count[s] 1 through 4* or to find the allegations of personal use and/or intentional discharge of a firearm true, that person must not only intentionally commit the prohibited act, but must do so with a specific intent. The act and the specific intent required are explained in the instruction for that crime or allegation." (Italics and underlining added.)

Even assuming for the sake of argument that a juror may have thought the gun allegations were crimes, it is unlikely that any juror would find defendant "personally" used a gun by aiding/abetting Troutman's possession of the gun, because CALCRIM No. 400 made a distinction between *personal* conduct and *aiding/abetting* conduct: "A person is guilty of a crime whether he or she committed it *personally or* aided and abetted the perpetrator." (Italics added.) The jury expressly found defendant "personally" used and "personally" discharged the gun.

We presume jurors are capable of understanding and following jury instructions. (*People v. Carey* (2007) 41 Cal.4th 109, 130.) We consider the instructions as a whole, not in artificial isolation. (*Smithey, supra*, 20 Cal.4th at pp. 963-964.) An instruction can be found to be ambiguous or misleading only if, in the context of the entire charge, there is a reasonable likelihood the jury misconstrued or misapplied its words. (*People v. Frye* (1998) 18 Cal.4th 894, 957.)

Here, the instructions as a whole do not support defendant's speculation that the jury may have found he "personally" used and discharged the gun on an "aiding and abetting" theory.

15

Moreover, in assessing whether the jury likely misunderstood the instructions, we may consider the prosecutor's closing arguments to the jury. (*People v. Mathson* (2012) 210 Cal.App.4th 1297, 1330-1331.) Although the instructions allowed the jury to consider aiding/abetting with respect to both the December 20th robbery (Count 3) and the December 27th attempted robbery (Count 2), the prosecutor argued aiding and abetting to the jury only with respect to Counts 3 and 4 -- the December 20th robbery and carjacking of James Reed. With respect to the December 27th attempted robbery of the Deluxe Market, the prosecutor did *not* argue aiding and abetting, nor did she need to, since defendant himself testified he was an active participant in the attempted robbery. The prosecutor argued to the jury that defendant was a direct and active participant in the attempted robbery, that defendant came into possession of the gun as Mr. Singh was grabbing at Troutman and pulling off his mask, that defendant fired the gun trying to hit Mr. Singh but instead accidentally hit his partner, and that the trajectory of the bullet was inconsistent with a self-inflicted wound. The prosecutor also argued the attempted robbery caused the death; it was all part of a continuous transaction -- they brought the gun to use in the attempted robbery and it discharged as they fled. Defense counsel's closing argument to the jury conceded defendant "is guilty of the attempted robbery." She conceded defendant, by his own testimony, intended and attempted to commit the robbery at the Deluxe Market, though she argued defendant while attempting to commit the robbery did not cause Troutman's death. She argued that if defendant was not holding the gun when it fired, he could not be found guilty of murder. And so she told the jury: "I'm not even going to talk to you about the special circumstances or the use of a gun, because you don't get there. Once you reach the ultimate conclusion, the just conclusion, you stop there. Everything is over as to that count [murder]." She continued: "As to Count 2, is [defendant] guilty of an attempted robbery of the Deluxe Market? Yes. Yes. The evidence has been proven beyond a reasonable doubt. [¶] So then you have to decide if he personally used a gun. That he did not. And you would have to

16

come back with a not true verdict or not true finding on that. And that's because of all of the evidence that we just spent a long time talking about. [¶] . . . [¶] You then must decide whether he personally and intentionally discharged the weapon. Again, no reliable, credible evidence that he did."

Defense counsel argued aiding and abetting only with respect to the December 20th robbery and carjacking of James Reed, arguing there was insufficient evidence that defendant aided and abetted those crimes, though conceding defendant was guilty of theft for driving off in the car knowing he did not have the owner's permission.

We conclude there is no reasonable likelihood that the jury found defendant "personally" used and discharged the gun on an aiding and abetting theory.

*Ability to Pay Attorney Fees*

At sentencing, the trial court said: "I'm also going to order attorney fees in the amount of $3,175. That would be based on the ability to pay, though." Defense counsel said, "Thank you. I can tell you right now there is no ability to pay." The court said, "I'll note that for the record." When the clerk asked about "any other fees," the court said all mandatory fines and fees were imposed, and discretionary ones were waived.

No hearing was held, as required by section 987.8, subdivision (b), which provides: "In any case in which a defendant is provided legal assistance, either through the public defender or private counsel appointed by the court, upon conclusion of the criminal proceedings in the trial court . . . the court may, after notice and a hearing, make a determination of the present ability of the defendant to pay all or a portion of the cost thereof. . . . The court may, in its discretion, order the defendant to appear before a county officer designated by the court to make an inquiry into the ability of the defendant to pay all or a portion of the legal assistance provided." Section 987.8, subdivision (g)(2)(B) provides in pertinent part: "Unless the court finds unusual circumstances, a

17

defendant sentenced to state prison shall be determined not to have a reasonably discernible future financial ability to reimburse the costs of his or her defense."

While a finding of ability to pay may be implied, it must be supported by substantial evidence. (*People v. Verduzco* (2012) 210 Cal.App.4th 1406, 1420-1421.) Where a trial court fails to hold the hearing and evidence is lacking, remand by the appellate court is an appropriate remedy. (*Ibid*.; *People v. Flores* (2003) 30 Cal.4th 1059, 1068-1069 [The defendant may not be able to pay the entire amount ordered by the court, but "he may be able to pay something," and instead of speculating whether a defendant sentenced to state prison has unusual circumstances, remand is appropriate to conduct a hearing into the matter so the trial court can make an "informed decision"].)

Defendant posits there is no point to remand and we should just strike the attorney fee order, because his trial counsel said defendant had no ability to pay; the prosecutor did not "counter" that representation; his probation report shows he was 19 years old with no occupation or income; and as a prisoner he has no future financial ability to pay. However, trial counsel's representation proves nothing and did not require a response from the prosecutor. The trial court obviously did not accept that representation, because the court ordered the reimbursement. The probation report is insufficient because, even if it shows no present job, section 987.8, subdivision (g)(2), allows the court also to consider "[a]ny other factor or factors which may bear upon" ability to pay. This would include, for example, whether defendant owns any real property or other assets subject to attachment and not otherwise exempt by law. (§ 987.8, subd. (a).) While that may be unlikely in this case, the record does not clearly show inability to pay, as asserted by defendant.

## DISPOSITION

We reverse the order for attorney fee reimbursement and remand to the trial court for a hearing on ability to pay.  The judgment is otherwise affirmed.


      HULL      , Acting P. J.


We concur:


      MURRAY      , J.


      HOCH      , J.